# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>*Allamakee County v. Purdue Pharma, et al; Case No. 1:18-op-45983-DAP*<br><br>ALLAMAKEE COUNTY, IOWA,<br><br>       *Plaintiff*,<br><br>    v.<br><br>HY-VEE, INC; AMBER ENTERPRISES, INC. D/B/A AMBER SPECIALTY PHARMACY; HYVACS, LLC D/B/A HY-VEE PHARMACY SOLUTIONS; REDBOX RX, LLC, AND VIVID CLEAR RX, INC.,<br><br>       *Defendants*. | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster<br><br>**PLAINTIFF ALLAMAKEE COUNTY, IOWA'S SUPPLEMENTAL AND AMENDED ALLEGATIONS TO BE ADDED TO THE COMPLAINT** |

## TABLE OF CONTENTS

I.　　　　INTRODUCTION ......................................................................................... 1

II.　　　JURISDICTION AND VENUE ..................................................................... 8

III.　　　PARTIES ............................................................................................................ 8

　　A.　Plaintiff ............................................................................................................. 8

　　B.　Defendants ...................................................................................................... 10

　　C.　Related Entities; Agency and Authority ................................................. 12

IV.　　　FACTS COMMON TO ALL CLAIMS ........................................................ 13

　　A.　Opioids and Their Effects .......................................................................... 13

　　B.　Defendants' Conduct Created an Abatable Public Nuisance ............. 15

　　C.　Defendants Deliberately Disregarded Their Duties to Maintain Effective Controls Against Diversion
　　............................................................................................................................ 16

　　　　1.　Defendants Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids.
　　　　.................................................................................................................. 16

　　　　2.　Defendants Have a Duty to Maintain Effective Controls Against Diversion. ....................... 17

　　D.　Defendants Have Corresponding Duties Under Iowa Law ................ 28

　　E.　Defendants were Aware of and Have Acknowledged their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders. ........... 29

　　F.　Defendants Worked to Expand their Shares of the Prescription Opioid Market and Failed to Maintain Effective Controls Against Diversion. ................ 36

　　G.　Hy-Vee Failed to Guard Against Diversion in Distributing and Dispensing in Allamakee County. ... 37

　　H.　Hy-Vee Performance Metrics Put Profits Before Safety ..................... 46

　　I.　Defendants Worked with Industry Members to Increase Their Profits and Lobbied Against Restrictions on Opioid Use and DEA Enforcement. ........................ 49

　　J.　Defendants worked with industry members, opioid manufacturers, and particularly purdue, to promote opioids and improperly normalize their widespread use. ......... 55

　　K.　The Opioids the Defendants Sold Migrated into Other Jurisdictions ........................... 66

L.    The Defendants Conspired to Engage In The Wrongful Conduct Complained Of Herein and
      Intended To Benefit Both Independently and Jointly From Their Conspiracy. ...............................70

V.      IOWA-SPECIFIC FACTS ...................................................................................................71

VI.     PLAINTIFF'S CLAIMS ARE TIMELY ........................................................................80

        A.    Continuing Conduct ..........................................................................................................80

        B.    Equitable Estoppel and Fraudulent Concealment ..........................................................80

VII.    SUCCESSOR LIABILITY .................................................................................................81

VIII.   ALTER EGO LIABILITY ..................................................................................................82

FIRST CLAIM FOR RELIEF ....................................................................................................83

SECOND CLAIM FOR RELIEF ................................................................................................91

THIRD CLAIM FOR RELIEF ..................................................................................................101

FOURTH CLAIM FOR RELIEF ..............................................................................................103

JURY DEMAND ........................................................................................................................106

Plaintiff, Allamakee County, Iowa (Plaintiff or Allamakee County) hereby supplements and amends its Complaint, dated August 17, 2018 (Doc. No. 1) (Complaint) and Short Form Amended Complaint, dated March 15, 2019 (Doc. No. 7), to prevent future harm and to redress past wrongs against Defendants Hy-Vee, Inc., Amber Enterprises, Inc. d/b/a Amber Specialty Pharmacy, HYVACS, LLC d/b/a Hy-Vee Pharmacy Solutions, RedBox Rx, LLC, and Vivid Clear Rx, Inc. (collectively, "Hy-Vee" or "Defendants").[1]

Plaintiff seeks to hold accountable Hy-Vee which reaped enormous financial rewards by helping to expand the market for prescription opioids beyond all reasonable limits, by utterly failing to comply with their gatekeeping obligation to protect the public and by refusing to monitor and restrict the improper distribution, dispensing and sale of opioids, causing a public nuisance in Allamakee County.

IN ADDITION TO THE ALLEGATIONS SET FORTH HEREIN, PLAINTIFF EXPRESSLY ADOPTS AND INCORPORATES BY REFERENCE THE ALLEGATIONS AND CLAIMS SET FORTH IN ITS COMPLAINT, INCLUDING ALL CLAIMS AND ALLEGATIONS AGAINST OTHER DEFENDANTS NAMED IN THAT COMPLAINT.

## I. INTRODUCTION

1. This case arises from the worst man-made epidemic in modern medical history—an epidemic of addiction, overdose and death cause by Defendants' flooding the United States, including Plaintiff's County, with prescription opioids.

2. By now, most Americans have been affected, either directly or indirectly, by the opioid epidemic.

3. This crisis arose not only from the opioid manufacturers' deliberate marketing strategy, but from distributors' and pharmacies' equally deliberate efforts to evade restrictions on opioid distribution and dispensing. Defendants acted without regard for the lives that would be trammeled in pursuit of profit.

[1] The newly added defendants in this pleading are all subsidiaries of Hy-Vee, Inc. and are Amber Enterprises, Inc. d/b/a Amber Specialty Pharmacy; HYVACS, LLC d/b/a Hy-Vee Pharmacy Solutions; RedBox Rx, LLC; and Vivid Clear Rx, Inc.

4.      Iowa is experiencing a drug overdose epidemic which is causing devastating socio and economic consequences.

5.      Prescription opioid deaths in Iowa have quadrupled from the late 1990s to the 2010s. While prescription drug overdose deaths and rates of opioid prescribing are low in Iowa compared to other states, rates of prescription opioid overdose deaths since 1999 have increased four-fold, making it only one of four states with such a dramatic increase.[2]

6.      Claims data show that between 2003 and 2014, an average of 77,653 Iowa residents per year were dispensed an opioid pain reliever.[3]



7.      Iowa Opioid deaths continued to rise between 2018 and 2021, up to 258 deaths opioid overdose deaths statewide in 2021. The number of deaths dropped slightly since 2021, to 213 in 2023.[4]

---

[2] The Prescription Opioid Crisis: Policy and Program Recommendations to Reduce Opioid Overdose and Deaths in Iowa August 1, 2017. (citing Gabbert K. Opioid treatment programs. Presentation at the Heroin and Opioids: A Community Crisis Summit. Iowa City IA, November 205.

[3] The Prescription Opioid Crisis: Policy and Program Recommendations to Reduce Opioid Overdose and Deaths in Iowa August 1, 2017.

[4]    https://www.cdc.gov/overdose-prevention/data-research/facts-stats/sudors-dashboard-fatal-overdose-data-accessible.html (last visited August 27, 2025)

8.     In addition, suspected opioid overdose visits to Iowa emergency departments peaked in 2021 at 887 visits, dropping slightly in 2022 to 834 visits.[5]

9.     Most states have begun the long road to recovery from the opioid epidemic, lodging overall decreases in overdose deaths. Yet, as of 2024, Iowa was one of only ten states where overdose deaths continued to increase.[6]



10.     Allamakee County is no exception to the epidemic. Opioid use has been and continues to be at crisis levels in Allamakee County.

_____

[5] https://hhs.iowa.gov/about/data-reports/health-disease/substance-use/drug-overdose (last visited August 29, 2025)

[6]     https://www.axios.com/local/des-moines/2024/10/01/overdoes-deaths-iowa-drugs-paraphernalia-fentanyl (last visited August 29, 2025)

11.     The CDC has tracked an average opioid dispensing rate of 30 opioid prescriptions dispensed per 100 persons in Allamakee County between 2019 and 2023.[7]

12.     Allamakee County is generally agricultural and rural in nature, with significant manufacturing and construction presence. Studies suggest that prescription opioids are a widespread problem across Iowa, and prescription opioid deaths tend to cluster in Iowa's rural counties, such as Allamakee County.

13.     This devastation in Allamakee County was created by opioid manufacturers, distributors, pharmacies, and others, who worked together to systematically dismantle the narcotic conservatism that had existed around prescription opioids for decades, opened the floodgates to an unreasonably large and unsafe supply of opioids, improperly normalized the widespread use of opioid drugs, violated laws and regulations designed to protect the public so more opioid drugs could be sold and the manufacturers, distributors, and pharmacies could reap the profits therefrom.

14.     Most Americans have been affected, either directly or indirectly, by the opioid epidemic. According to the United States Center for Disease Control and Prevention ("CDC"), prescription opioids have directly and indirectly accounted for more than 80% of overdose deaths in the United States, a toll that has quadrupled over the past two decades. More people have died from opioid-related causes than from car accidents or guns. More than 175 people die every day from opioid overdoses—as if an airplane were to crash, killing everyone on board, every day.

15.     The death toll has steadily climbed since the push to expand prescription opioid use began in the late 1990s. The CDC's National Center for Health Statistics provides provisional data on drug overdose deaths. According to the data, there were an over 107,000 drug overdose deaths in the United States during 2023.

16.     The epidemic's economic costs for healthcare, lost productivity, addiction treatment, and criminal justice involvement is estimated at $1.02 trillion a year.

---

[7]     https://www.cdc.gov/overdose-prevention/data-research/facts-stats/opioid-dispensing-rate-maps.html (last visited August 27, 2025)

17.     From 1999 through present, overdoses killed more than 1 million Americans. Well over half of them died from opioids prescribed by doctors to treat pain. These opioids include brand-name prescription medications such as OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone, hydrocodone, and fentanyl.

18.     Most of the overdoses from non-prescription opioids are also directly related to prescription pills. As soon as prescription opioids took hold on a population, the logical and devastating progression to illicit drugs followed. Many opioid users, having become addicted to but no longer able to obtain prescription opioids, or trapped in a cycle of addiction, turn to stronger and more potent drugs.

19.     According to the CDC, the rise in opioid overdose deaths can be outlined in three distinct waves. As the CDC explains: "The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1993. The second wave began in 2010, with rapid increases in overdose deaths involving heroin. The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl."[8]

20.     The conduct of the manufacturers, distributors, and pharmacies, among others, caused the nation, including Iowa and Allamakee County, to be awash in a flood of prescription opioids. This has had a profound impact on both morbidity and mortality, and these drugs have created an epidemic of addiction that has had severe and wide-ranging effects on public health and safety in Allamakee County and communities across the country. Indeed, from those suffering with the disease of addiction themselves, to children whose parents who suffer from addiction, to employers who employ an addicted population, to the first responders, law enforcement, the court system and the prison system that cannot handle the burdens placed on them, there is almost no area of the community that has not been significantly impacted.

21.     This suit takes aim at a substantial contributing cause of the opioid crisis. The Defendants, operating as both a distributor and dispenser of prescription opioids, the last link in the opioid supply  and

---

[8] CDC Health Topics – Opioid Overdose, https://www.cdc.gov/policy/polaris/healthtopics/opioid/index.html (last visited September 4, 2024).

the critical gatekeeper between dangerous opioid narcotics and the public, utterly failed in their gatekeeper role, flouted their duties to protect the public, violated the laws designed to protect the public and dismantled and disregarded measures designed to protect the public health and safety. As alleged in more detail herein: (1) as a distributor, Hy-Vee failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, or halt suspicious orders when they were identified; and (2) as a dispenser, Hy-Vee failed to maintain effective controls against diversion and to ensure that only valid prescriptions were filled. All of this actively contributed to the oversupply of such drugs and fueled an illegal secondary market.

22.    Defendants have contributed substantially to the opioid crisis by helping to inflate the opioid market beyond any legitimate bounds and by flooding that market with far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders and sales, and to identify and refuse to fill prescriptions with indicia of abuse and diversion, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

23.    As millions became addicted to opioids, "pill mills," often styled as "pain clinics," sprouted nationwide and rogue prescribers stepped in to supply prescriptions for non-medical use. These pill mills, typically under the auspices of licensed medical professionals, issue high volumes of opioid prescriptions under the guise of medical treatment. Prescription opioid pill mills and rogue prescribers cannot channel opioids for illicit use without at least the tacit support and willful blindness of the Defendants, if not their knowing support.

24.    As a direct and foreseeable result of Defendants' conduct, cities, towns and counties across the nation, including the Allamakee County, are now swept up in what the CDC has called a "public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."[9] The increased

---

[9] *Examining the Growing Problems of Prescription Drug and Heroin Abuse*, Ctrs. For Disease Control and Prevention (Apr. 29, 2014), https://docs.house.gov/meetings/IF/IF02/20140429/102161/HHRG-113-IF02-Wstate-SosinD- 20140429.pdf (last visited September 4, 2024); *see also*, Letter from Vivek H. Murthy, Surgeon General, Tide RX (Aug. 2016),

volume of opioid prescribing, not all of which is for legitimate use, correlates directly to skyrocketing addiction, overdose and death; black markets for diverted prescriptions opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire or could not afford prescription opioids.

25.     This explosion in opioid use and Defendants' profits has come at the expense of patients and residents and has caused ongoing harm to and a public nuisance in the Allamakee County. As the then CDC director concluded: "We know of no other medication routinely used for a nonfatal condition that kills patients so frequently."[10]

26.     Defendants' conduct in promoting opioid use and fueling diversion has had severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction and overdose from illicit drugs such as heroin and fentanyl. These necessary and costly responses to the opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarceration, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements, among others.

27.     The burdens imposed on Plaintiff are not the normal or typical burdens of government programs and services. Rather, these are extraordinary costs and losses that are related directly to Defendants' illegal actions. The Defendants' conduct has created a public nuisance and a blight. Governmental entities, and the services they provide their citizens, have been strained to the breaking point by this public health crisis.

28.     Defendants have not changed their ways or corrected their past misconduct but instead are continuing to fuel the crisis and perpetuate the public nuisance.

29.     Within the next hour, six Americans will die from opioid overdoses; and two babies will be born addicted to opioids and begin to go through withdrawal.

---

[10] *Id.*

30.     Plaintiff brings this suit to bring the devastating march of this epidemic to a halt and to hold Defendants responsible for the crisis they caused.

## II.  JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 because Plaintiff's original claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. in the original Complaint raise a federal question. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims against the Defendants named in these Supplemental and Amended Allegations under 28 U.S.C. § 1367 because those claims are so related to the RICO claims as to form part of the same case or controversy.

32.     This Court has supplemental jurisdiction of the County's state-law claims under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

33.     This Court also has personal jurisdiction over all Defendants because the causes of action alleged in this Complaint arise out of Defendants' transacting business in Iowa, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because Defendants regularly does or solicits business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in this state. Defendants have purposefully directed their actions towards Iowa and/or have the requisite minimum contacts with Iowa to satisfy any statutory or constitutional requirements for personal jurisdiction.

34.     Venue is proper in this district under 28 U.S.C. § 1407.

## III. PARTIES

### A.  Plaintiff

35.     Plaintiff, Allamakee County ("Plaintiff" or Allamakee County") has standing to bring the claims alleged herein.

36.     Plaintiff is responsible for the public health, safety and welfare of its citizens.

37.     Plaintiff provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

38.     Plaintiff has declared, *inter alia*, that opioid abuse, addiction, morbidity and mortality have created a serious public health and safety crisis, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

39.     The distribution and diversion of opioids into Iowa ("the State"), and into Allamakee County, Iowa and surrounding areas (collectively, "Allamakee County"), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

40.     Plaintiff has standing to bring claims under the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing).

41.     Plaintiff directly and foreseeably sustained all economic damages alleged more fully herein. Plaintiff, like any other local government, endeavors in good faith to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. Defendants' conduct has imposed an extraordinary burden on the Allamakee County's limited resources and services for which it seeks relief.

42.     Categories of past and continuing sustained damages include, inter alia: (1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation and (6) costs associated with Plaintiff having to repair and remake its infrastructure, property and systems that have been damaged by Defendants' actions, including, *inter alia*, its property and systems to treat addiction and abuse, to respond to and manage an elevated level of crime, to treat injuries, and to investigate and process deaths in Allamakee County. These damages have been suffered, and continue to be suffered, directly by the Plaintiff.

B.  **Defendants**[11]

43.     Defendant Hy-Vee, Inc.is an Iowa corporation with its principal place of business in West Des Moines, Iowa.

44.     Hy-Vee, Inc. is registered to do business in Iowa and may be served through its registered agent CT Corporation System, 400 E. Court Ave., Des Moines, Iowa, 50309.

45.     Defendant Amber Enterprises, Inc. d/b/a Amber Specialty Pharmacy is a Nebraska corporation with its principal place of business in Omaha, Nebraska.

46.     Amber Enterprises, Inc. may be served through its registered agent Corporate Creations Network Inc., 12020 Shamrock Plaza #200, Omaha, Nebraska, 68154.

47.     Amber Enterprises, Inc. d/b/a Amber Specialty Pharmacy is a specialty pharmacy founded in 1998 which became a wholly-owned subsidiary of Hy-Vee, Inc in 2014.

48.     Amber Enterprises, Inc. d/b/a Amber Specialty Pharmacy serves patients in all 50 states, plus Puerto Rico.

49.     HYVACS, LLC d/b/a Hy-Vee Pharmacy Solutions is an Iowa limited liability company with its principal place of business in Omaha, Nebraska.

50.     HYVACS, LLC may be served through its registered agent CT Corporation System, 400 E. Court Ave., Des Moines, Iowa, 50309

51.     HYVACS, LLC d/b/a Hy-Vee Pharmacy Solutions is a wholly owned subsidiary of Hy-Vee, Inc. and is a specialty pharmacy providing services throughout the Midwest.

52.     HYVACS, LLC d/b/a Hy-Vee Pharmacy Solutions offers pharmacy delivery and pick up at Hy-Vee Pharmacy locations.

---

[11] The County has made its best efforts, based on the information available, to identify all of the corporate entities with responsibilities related to the sale and distribution of opioids in or affecting the County. If information that becomes available to the County alters its understanding or discloses additional entities, the County reserves the right to seek to join any such entities as defendants. Furthermore, the County recognizes that corporate entities affiliated with the Defendants may possess discoverable information relevant to the County's claims, even though those entities have not been named as defendants. The County reserves the right to seek all information relevant to these claims.

53.    RedBox Rx, LLC is an Iowa limited liability company with its principal place of business in West Des Moines, Iowa.

54.    RedBox Rx, LLC may be served through its registered agent CT Corporation System, 400 E. Court Ave., Des Moines, Iowa, 50309

55.    RedBox Rx, LLC is a telehealth and pharmacy provider and is a division of Hy-Vee, Inc.

56.    Vivid Clear Rx, Inc.  is a Nebraska corporation with its principal place of business in Omaha, Nebraska.

57.    Vivid Clear Rx, Inc. may be served through its registered agent CT Corporation System, 5601 South 59th Street, Lincoln, NE, 68516.

58.    Vivid Clear Rx, Inc. is a subsidiary of Hy-Vee, Inc. and is a pharmacy benefit manager.

59.    Hy-Vee, through its various subsidiaries and affiliated entities, including those acting as DEA registrants, conducts business as a registered wholesale distributor and as a pharmacy.

60.    Hy-Vee operates more than 240 supermarkets across Iowa, Illinois, Kansas, Minnesota, Missouri, Nebraska, South Dakota, and Wisconsin. Of these supermarkets, approximately 150 are located in Iowa. Most, if not all, Hy-Vee supermarkets contain a pharmacy.

61.    Hy-Vee owns and operates the Oelwein Dollar Fresh Hy-Vee store and pharmacy in neighboring Fayette County. Hy-Vee also owns and operates Hy-Vee stores and pharmacies in nearby Fillmore County, Minnesota and La Crosse County, Wisconsin.

62.    While Hy-Vee does not currently own or operate any pharmacies in Allamakee County proper, at all times relevant to this Complaint, Hy-Vee distributed and sold prescription opioids through the Midwestern United States, including in Iowa, and, given the rural nature of Allamakee County and presence of Hy-Vee pharmacies in neighboring counties, likely sold and dispensed to residents of Allamakee County.[12]

---

[12] Pursuant to the Case Management Order for Hy-Vee Bellwether Tracks, (Doc. No. 6241), Hy-Vee's deadline to produce dispensing data for the State of Iowa, including Allamakee County, is October 30, 2025.

63.     Hy-Vee also operates specialty and mail order pharmacies that fill prescriptions for patients across 50 states and Puerto Rico.

64.     Defendants' intentional, negligent, and/or unlawful conduct, alleged more fully herein, has created a serious public health crisis of opioid abuse, addiction, morbidity, and mortality and is a public nuisance in Allamakee County.

65.     Defendants' conduct is beyond anything Plaintiff could have prepared for, predicted or avoided. It is a repeated course of conduct that did, does, and will—given the realities of addiction—continue to result in recurring and ongoing harm to Plaintiff. Defendants' conduct is especially pernicious when one considers the harm it has wreaked on governmental entities such as the County who, in good faith, endeavor to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. The magnitude of Defendants' scheme is neither discrete nor of a sort that a municipality, including the County, could reasonably expect to have to respond to at any time during its existence as such. It would be unreasonable, unjust, and inequitable not to allocate the additional governmental expenses, and any other costs associated with the harms Defendants' wrongful conduct has caused, to the actual parties responsible for creating the need for the resources to be expended as they are and were.

### C.  Related Entities; Agency and Authority

66.     Defendants include the entities named above as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

67.     All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

68.     Plaintiff alleges that the corporate parents named as Defendants in this Complaint are liable as a result of their own actions and obligations in distributing and selling opioids, and not solely because of their vicarious responsibility for the actions of their pharmacy stores.

## IV. FACTS COMMON TO ALL CLAIMS[13]

### A.    Opioids and Their Effects

69.     The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

70.     The medicinal properties of opioids have been recognized for millennia—as well as their potential for abuse and addiction. The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine.

71.     Early use of opium in Western medicine was with a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today. Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

72.     In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine. During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with morphine addictions. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911, "The habit has this nation in its grip to an astonishing extent. Our prisons and our hospitals are full of victims of it, it has robbed ten thousand

---

[13] The allegations in this Complaint are made upon information and belief, including upon information immediately available to Plaintiff from the ARCOS database.

businessmen of moral sense and made them beasts who prey upon their fellows . . . it has become one of the most fertile causes of unhappiness and sin in the United States."14

73.     In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the U.S. was limited to prescription only in 1914 and then banned altogether a decade later.

74.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

75.     Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970.

76.     Medical professionals describe the strength of various opioids in terms of morphine milligram equivalents ("MME"). According to the CDC, doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and one study found that patients who died of opioid overdose were prescribed an average of 98 MME/day.

77.     Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids—the "high." However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

---

[14] Nick Miroff, *From Teddy Roosevelt to Trump: How Drug Companies Triggered an Opioid Crisis a Century Ago,* The Washington Post (Oct. 17, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/09/29/the-greatest-drug-fiends-in- the-world-an-american-opioid-crisis-in-1908/ (last visited September 4, 2024).

78.     Discontinuing opioids after more than just a few weeks will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

### B.     Defendants' Conduct Created an Abatable Public Nuisance

79.     As alleged throughout this Complaint, Defendants' conduct has created a public health crisis and a public nuisance.

80.     The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated by, inter alia, educating prescribers and patients regarding the true risks and benefits of opioids, including the risk of addiction; providing addiction treatment to patients who are already addicted to opioids, making naloxone widely available so that overdoses are less frequently fatal, and a number of other proven measures to address the epidemic.

81.     Defendants have the ability to act to help end the public nuisance, and the law recognizes that they are uniquely well positioned to do so. All companies in the supply  of a controlled substance are primarily responsible for ensuring that such drugs are only distributed and sold to appropriate patients and not diverted. These responsibilities exist independent of any Food and Drug Administration ("FDA") or DEA regulations, to ensure that their products and practices meet both federal and state laws and regulations. As registered manufacturers, distributors and/or dispensers of controlled substances, Defendants are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribers and orders, to act as a key line of defense. Defendants, however, instead abused their position of special trust and responsibility within the closed system of opioid distribution and dispensing and fostered a black market for prescription opioids.

**C.**     **Defendants Deliberately Disregarded Their Duties to Maintain Effective Controls Against Diversion**

**1.     Defendants Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids.**

82.     Defendants earned enormous profits by flooding the country with prescription opioids. They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as distributors and retail sellers of opioids. Yet, instead of taking any meaningful action to stem the flow of opioids into communities, Defendants continued to participate in the oversupply and profit from it.

83.     Defendants do substantial business across the United States. This business includes the distribution and sale of prescription opioids.

84.     Data from the Automation of Reports and Consolidated Orders System ("ARCOS") confirms that Defendants distributed and/or dispensed substantial quantities of prescription opioids in Iowa and in counties neighboring Allamakee County. Given the rural nature of Allamakee County and presence of Hy-Vee pharmacies in neighboring counties, likely sold and dispensed to residents of Allamakee County.

85.     In addition, Hy-Vee distributed and dispensed substantial quantities of prescription opioids in other states and other counties, and these drugs were diverted from these other states and counties to Allamakee County. Defendants failed to take meaningful action to stop this diversion despite their knowledge of it, and thus contributed substantially to the diversion problem.

86.     For over a decade, Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers.

87.     Each participant in the supply  of opioid distribution, including Defendants, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring, and reporting suspicious activity.

2. **Defendants Have a Duty to Maintain Effective Controls Against Diversion**.

88.     State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent distributors and pharmacies would not fall. Together, these laws and industry guidelines make clear that Defendants possess and are expected to possess, specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription opioids and of the risks and dangers of the diversion of prescription opioids when the supply  is not properly controlled.

89.     Further, these laws and industry guidelines make clear that Defendants have a responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

90.     The privilege of holding a license to manufacture, distribute and/or dispense controlled substances comes with the responsibility of ensuring that the controlled substances distributed or sold are not diverted and/or subject to abuse and misuse. State and federal laws also have developed fairly uniform standards of practice across the country. It is both intuitive and understood that selling drugs for non-medical purposes, or drugs which the seller knows or should know present a significant risk for diversion falls outside the standards of care and is not a legitimate practice. As part of usual and customary practice, prescriptions must be evaluated and determined to be valid and issued for a legitimate medical purpose.

91.     Multiple sources impose duties on the Defendants.

92.     First, under the common law, Defendants had a duty to exercise reasonable care in delivering and dispensing dangerous narcotic substances. By flooding Iowa, and Allamakee County, with more opioids than could be used for legitimate medical purposes, by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, and by Hy-Vee's failure to maintain effective controls against diversion from its retail stores, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

17

93.     Second, Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

94.     Third, Defendants were required to register with the DEA to distribute and/or dispense controlled substances under the federal Controlled Substances Act ("CSA"). See 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100; 28 C.F.R. § 1301.71.

95.     The federal CSA imposes duties on Defendants that are discussed in detail below.

96.     Fourth, Defendants also had duties under applicable Iowa law, and were regulated by the Iowa Board of Pharmacy. *See, e.g.*, I.C.A. § 124.303.

97.     Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970. The CSA and its implementing regulations created a closed- system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed of distribution to prevent the diversion of controlled substances into the illicit market. Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[15] Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery . All registrants must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion. Maintaining the closed system under the CSA and effective controls to guard against diversion is a vital public health concern. Controlled substances, and prescription opioids specifically, are recognized as posing a high degree of risk from abuse and diversion. When the supply  participants at any level fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of addiction that has occurred.

98.     The CSA requires manufacturers, distributors and pharmacies, along with other participants in the supply  of controlled substances like opioids to: (a) limit sales within a quota set by the

---

[15] H.R. Rep. No. 91-1444, *reprinted in* 1979 U.S.C.C.A.N. at 4572.

DEA for the overall production of controlled substances like opioids; (b) register to distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) identify suspicious orders of controlled substances and halt such sales.

### a) CSA Duties of Wholesale Distributors

99.     Federal law requires that distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(a)(1), (b)(1).

100.    In addition to their overall duty to provide effective controls against diversion, registrants that are wholesale distributors (a) must design and implement a system, to identify suspicious orders; (b) report suspicious orders to the DEA; and (c) not ship suspicious orders unless and until they are able to establish, through due diligence, that they are not likely to be diverted. See 21 C.F.R. § 1301.74; see also *Masters Pharm. Inc.*, 80 Fed. Reg. 55418-01, 2015 WL 5320504 (DEA Sept. 15, 2015); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *4-10 (N.D. Ohio Aug. 19, 2019); *City & County of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 951-52 (N.D. Cal. 2022).

101.    Specifically, Defendants were required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. Defendants were further required to take steps to halt suspicious orders. "The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b). Other factors that may raise suspicions may include, for example, ordering the same controlled substance from multiple distributors. Defendants violated their obligations under federal law.

102.    These criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious.

The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry.

103.    Once a registrant has identified a suspicious order, it must refuse to ship that order unless and until it can establish, through due diligence, that the order is unlikely to be diverted.

104.    The investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order nonsuspicious and exempt it from the requirement that the distributor inform the DEA about the order. Put another way, if, even after investigating the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the Agency must be informed. Indeed, the DEA may revoke a distributor's certificate of registration as a vendor of controlled substances if the distributor identifies orders as suspicious and then ships them without performing adequate due diligence.

105.    To comply with the law, wholesale distributors, including Defendants, also must know their customers and the communities they serve. Each distributor must "perform due diligence on its customers" on an "ongoing [basis] throughout the course of a distributor's relationship with its customer." *Masters Pharms., Inc.*, 80 Fed. Reg. 55,418, 55,477 (DEA Sept. 15, 2015), petition for review denied, 861 F.3d 206 (D.C. Cir. 2017).

106.    Defendants, as distributors, have a duty, and are expected, to be vigilant in ensuring that controlled substances are delivered only for lawful purposes.

**b) CSA Duties of Dispensers**

107.    Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." See 21 C.F.R. § 1301.71(a).

108.    In addition to their overall duty to provide effective controls against diversion, registrants that dispense opioids are prohibited from filling prescriptions that are not written for a legitimate medical purpose. See 21 C.F.R. § 1306.04(a); *see also In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 739, 784-85 (N.D. Ohio 2022) (quoting jury instruction that described CSA duties of dispensers); *City & County of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 958-59 (N.D. Cal. 2022). Dispensers

must review prescriptions for red flags, perform due diligence on prescriptions that raise red flags, and refuse to fill prescriptions for which red flags cannot be resolved. Not only the pharmacists at the dispensing counter, but the pharmacy itself and its corporate parents, are required to ensure that only valid prescriptions are filled.

109.    Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency. 21 U.S.C. § 829(a). Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner. *Id.*

110.    Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA. 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

111.    A prescription, whether written or oral, is legally valid under the CSA only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id.*

112.    As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." *Id.* Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

113.    Regardless of whether they are registrants, all dispensers must ensure that prescriptions of controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *Id.* The DEA has recognized that "as dispensers of controlled

substances, pharmacists and pharmacy employees are often the last line of defense in preventing diversion."16

114.    Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually, or employed in a registered pharmacy…." 21 C.F.R. § 1306.06.

115.    Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, but only if, such dispensing would be in accordance with a generally accepted, objective standard of practice—i.e., "the usual course of his [or her] professional practice" of pharmacy. *Id.*

116.    Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose. See 21 C.F.R. §§ 1306.04, 1306.06.

117.    Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions. 21 U.S.C. §§ 842, 843.

118.    A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[17] The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate.[18] The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.[19] A pharmacist's corresponding responsibility extends to the pharmacy itself.

---

[16] 2012 Dear Registrant letter to pharmacy registrants, Feb. 9, 2012, http://ppsconline.com/articles/2012/FL_PDAC.pdf (last visited September 4, 2024).

[17] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, Pharmacist's Manual: An Informational Outline of the Controlled Substances Act (Rev. 2020); *City & Cnty. of San Francisco v. Purdue Pharma, L.P.*, 620 F. Supp. 3d 936, 959-60 (N.D. Cal. 2022).

[18] City & Cnty. of San Francisco, 620 F. Supp. 3d at 960.

[19] *Id.*

119.    A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule and both the pharmacy and pharmacists may be the subject of further discipline.[20]

120.    The DEA has repeatedly emphasized that retail pharmacies, such as Hy-Vee, are required to implement systems that detect and prevent diversion and must monitor for and report red flags of diversion. When red flags appear, the pharmacy's "corresponding responsibility" under 21 C.F.R. § 1306.04(a) requires it either to take steps (and document those steps) to resolve the issues or else to refuse to fill prescriptions with unresolvable red flags.[21] The DEA has identified several types of "unresolvable red flags" which, when present in prescriptions presented to a pharmacist, may never be filled by the overseeing pharmacist. These unresolvable red flags include: a prescription issued by a practitioner lacking valid licensure or registration to prescribe the controlled substances; multiple prescriptions presented by the same practitioner to patients from the same address; prescribing the same controlled substances in each presented prescription; a high volume of patients presenting prescriptions and paying with cash; and, a prescription presented to by a customer who has traveled significant and unreasonable distances from their home to see a doctor and/or to fill the prescription at the pharmacy.

121.    The DEA guidance also instructs pharmacies to monitor for red flags that include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances as compared to other practitioners in the area, and (2) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time. Most of the time, these attributes are not difficult to detect and should be easily recognizable by the pharmacies' diversion control systems.

---

[20] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* (Rev. 2020) (citing *Jones Total Healthcare, L.L.C., v. DEA*, 881 F.3d 823 (11th Cir. 2018)).

[21] *Pharmacy Doctors Enterprises, Inc. v. Drug Enf't Admin.*, No. 18-11168, 2019 WL 4565481, at *5 (11th Cir. Sept. 20, 2019).

122.    "[T]he due diligence process involves four steps: identify any red flags, obtain information relevant to resolving the red flags, obtain information relevant to resolving the red flags, evaluate the information, and document the reasons supporting filling or refusing to fill the prescription."[22]

123.    As explained above, under the CSA, the duty to prevent diversion lies with the pharmacy, such as Hy-Vee, not just with the individual pharmacist. As such, although it acts through its agents, the pharmacy is ultimately responsible to prevent diversion.[23] Further, as described above, the obligations under the controlled-substances laws extend to any entity selling prescription opioids, whether it is the registration holder or not. It is unlawful for any person knowingly to distribute or dispense controlled substances other than in accordance with the requirements of the federal CSA and its implementing regulations, or in violation of state controlled substances laws and regulations. Pharmacies such as Hy-Vee are responsible "persons" under the CSA. They also exert control over their agents, including the responsibility to ensure they comply with applicable laws and regulations in all dispensing of controlled substances. Hy-Vee cannot absolve itself of its own obligations by attempting to place unilateral responsibility on its agents.

124.    In a 2016 presentation to the American Pharmacists Association, the DEA reiterated that retail pharmacies must watch for red flags such as large numbers of customers who receive the same combination of prescriptions, receive the same strength of controlled substance prescription (often for the strongest dose), have prescriptions from the same prescriber, and have the same diagnosis code.

---

[22] *City & Cnty. of San Francisco*, 620 F. Supp. 3d at 960.

[23] *The Medicine Shoppe; Decision and Order*, 79 FR 59504, 59515 (DEA Oct. 2, 2014); *see also Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order, 77 FR 62316-01 ("When considering whether a pharmacy has violated its corresponding responsibility, the Agency considers whether the entity, not the pharmacist, can be charged with the requisite knowledge."); *Top RX Pharmacy*; Decision and Order, 78 FR 26069, 62341 (DEA Oct. 12, 2012) (same); *cf. Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration,* 881 F.3d 82 (11th Cir. 2018) (revoking pharmacy registration *inter alia,* dispensing prescriptions that prescriptions presented various red flags, i.e., indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

125.     In the context of bellwether cases brought by governmental plaintiffs, the MDL Court held that "both pharmacists and pharmacies bear all the obligations imposed [by the CSA] upon practitioners and dispensers." *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 626 (N.D. Ohio 2020) (Doc. No. 3403). The Court further held that, in light of the data that pharmacies are required, by law, to collect, they must make use of that data to provide effective controls against diversion. *Id.* As the Court explained:

> [A] pharmacy is required to: (1) collect and maintain specific records and data regarding its dispensing activity; (2) employ a properly licensed pharmacist; and (3) properly dispense controlled substances and avoid diversion.  Therefore, both the pharmacy and the pharmacist must cooperatively identify and resolve "red flags" prior to dispensing controlled substances.  The Court concludes these requirements collectively mean that the Pharmacy Defendants cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled.  Possessing, yet doing nothing with, information about possible diversion would actually *facilitate* diversion, and thus violate the CSA's fundamental mandate that "*All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances.*" 21 C.F.R. § 1301.71(a).[24]

126.     Similarly, in a case remanded from the MDL, Judge Charles Breyer of the United States District Court for the Northern District of California held that the CSA "requires pharmacists and pharmacies to identify and resolve objective signs" when a prescription is presented "that create 'a reasonable suspicion that the prescription is not, on its face, legitimate.'" *City & Cnty. of San Francisco*, 620 F. Supp. 3d. at 960. Judge Breyer further held that the elements of a CSA violation in this context are that "(1) a pharmacy dispensed a controlled substance, (2) "a red flag was or should have been recognized at or before the time the controlled substance was dispensed," and (3) "the question created by the red flag was not resolved conclusively prior to the dispensing of the controlled substance." The Court further noted that "Prescriptions with unresolved red flags cannot be dispensed." *Id.* at 999-1000.

127.     In addition to its duties as a distributor, as a dispenser, Hy-Vee also had a duty to design and implement systems to prevent diversion of controlled substances in its retail pharmacy operations.

---

[24] *Id.* at 631 (emphasis by the Court).

Hy-Vee had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions suggestive of potential diversion. It also has a crucial role in creating -wide systems to identify and avoid filling "prescriptions" that are not issued for a legitimate purpose or by a prescriber with a valid, current license.

128.    Pharmacies' obligations extend to monitoring, and documenting, the steps they take in accessing state prescription drug monitoring programs, often referred to as "PDMPs." Yet, as described below, for many years Hy-Vee relied on its pharmacists' discretion in this area rather than setting forth requirements concerning PDMP searches and implementing systems to track and document PDMP searches and their results for, inter alia, dispensing prescriptions that prescriptions presented various red flags.

129.    Pharmacy order data provides detailed insight into the volume, frequency, dose, and type of controlled and non-controlled substances a pharmacy typically orders. This includes non-controlled substances and Schedule IV controlled substances (such as benzodiazepines), which are not reported to the DEA, but whose use with opioids can be indicative of diversion.

130.    As acknowledged in an article CVS published in the New England Journal of Medicine, "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in particular." Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H., Abusive Prescribing of Controlled Substances - A Pharmacy View, N. ENGL. J. MED. 369;11, Sept. 12, 2013, at 989-991. The DEA has identified "both pharmaceutical distributors and  pharmacies as part of the problem" contributing to opioid abuse and related deaths. *Id.*

131.    Pharmacies such as Hy-Vee have a particular "advantage" in meeting their obligations under the CSA because these entities can use "aggregated information on all prescriptions filled at the " in order to examine "patterns" of opioids and other "high-risk drugs" and target "inappropriate prescribing." *Id.* at 990. For example, a pharmacy should properly use its wide dispensing data to identify "high risk prescribers" by "benchmarking" prescription data based on "several parameters," including "volume of prescriptions for high-risk drugs," "the proportion of the prescriber's prescriptions that were for such [high-risk] drugs, as compared with the volume and proportion for others in the same specialty

and region," cash payment, ages of patients, and the prescriber's ratio of "prescriptions for noncontrolled substances with prescriptions for controlled substances." *Id.* This "[a]nalysis of aggregated data" from pharmacies can "target patterns of abuse," in the face of "the growing use of controlled substances and resulting illnesses and deaths." *Id.*

132.   According to law and industry standards, if a pharmacy finds evidence of prescription diversion, the relevant state's Board of Pharmacy and the DEA must be contacted.

133.   Pharmacies' evaluation process includes with what is known as "Drug Utilization Review" or "DUR." This practice is both part of traditional roles and duties and codified in federal and state statutes. Notably, during the rulemaking practice for one authority, the Omnibus Budget [R]econciliation Act of 1990 (OBRA 90), a commenter suggested that instructions for compliance with prospective DUR should go to the pharmacist and not the pharmacy. In response, the government stated that "the instructions for compliance with prospective DUR should be directed to the pharmacies," and that "[t]he owners or managers of pharmacies, as Medicaid providers, are responsible for furnishing their staff with information pertaining to DUR." States, seeking to assure uniformity, have taken action to require the same mandates as this federal law. The DUR process includes looking at over-utilization, drug interactions and identifying abuse and misuse of dangerous drugs such as opioids. This process provides pharmacies with information about potential diversion as well.

134.   Accordingly, states, including Iowa, revised and expanded practice acts and rules and increased their support for, and reliance on, Prescription Drug Monitoring Programs (PDMPs), which continued to grow over time.

135.   Additionally, pharmacies such as Hy-Vee have operating systems and methods to store and retain prescription dispensing data and records. The information they possess must be readily retrievable, and they have an obligation to use the information to identify patterns of diversion, conduct internal audits and training programs, investigate suspicious prescribers, patients, and pharmacists, and prevent diversion of controlled substances. Their hiring, training, and management of pharmacy personnel, and supporting policies, procedures, and systems should and must promote public health and safety and assist in the identification and prevention of the diversion of controlled substances.

### D.  Defendants Have Corresponding Duties Under Iowa Law

136.    In addition to the CSA, Defendants were also required to comply with Iowa controlled substances laws and pharmacy regulations.

137.    As under federal law, opioids are a Schedule II controlled substances under Iowa law. *See* I.C.A. § 124.205. Opioids are categorized as "Schedule II" drugs because they have a "high potential for abuse" and the potential to cause "sever psychic or physical dependence" and/or "severe psychological . . . dependence." 21 U.S.C. § 812(b)(2)(A)- (C); see also I.C.A. § 124.205.

138.    Iowa law requires all manufacturers, distributors, and dispensers of controlled substances drugs to register with the Iowa Board of Pharmacy. I.C.A. § 124.302(1); see also I.C.A. § 124.101.

139.    The board shall register an applicant to manufacture or distribute controlled substances unless it determines that the issuance of that registration would be inconsistent with the public interest. In determining the public interest, the board shall consider all of the following factors: (a) maintenance of effective controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels; (b) compliance with applicable state and local law; (c) any convictions of the applicant under any federal and state laws relating to any controlled substance, (d) past experience in the manufacture or distribution of controlled substances, and the existence in the applicant's establishment of effective controls against diversion, (e) furnishing by the applicant of false or fraudulent material in any application filed under this chapter, (f) suspension or revocation of the applicant's federal registration to manufacture, distribute, or dispense controlled substances as authorized by federal law, and (g) any other factors relevant to and consistent with the public health and safety. I.C.A.§ 124.303.

140.    Defendants were required to keep records and maintain inventories in conformance with the recordkeeping and inventory requirements of federal law and any additional requirements that may be issued by the board. I.C.A. § 124.306. Controlled substances in schedules I and II could only be distributed by a registrant to another registrant pursuant to an order form. I.C.A. § 124.307.

141.    Pursuant to I.C.A.§ 124.308, effective July 1, 2019, a pharmacist shall not fill a prescription for a schedule II controlled substance more than six months after the date on which the prescription was issued, a schedule II controlled substance prescription shall not be refilled, a prescription for a schedule II, IV, or V controlled substance shall not be filled or refilled more than six months after the date on which the prescription was issued or be refilled more than five times. Finally, a controlled substance shall not be distributed or dispensed other than for a medical purpose.

142.    As a distributor and dispenser, Hy-Vee was required to comply with requirements of the Iowa Board of Pharmacy and Iowa law regarding distribution, dispensing, and recordkeeping. I.C.A. § 124.1, *et. seq*.

143.    Hy-Vee was also required to comply with the reporting requirements under federal law.

144.    Furthermore, Iowa Law incorporates federal requirements set out under CSA and related controlled substance laws and regulations. See, .e.g., I.C.A. 124.306-124.307.

### E.    Defendants were Aware of and Have Acknowledged their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders.

145.    The regulations aim to create a "closed" system in order to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical. Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

146.    Defendants were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

147.     Indeed, the DEA has repeatedly informed Defendants about their legal obligations, including obligations that were so obvious that they simply should not have required additional clarification. As former DEA agent Joseph Rannazzisi explained during a deposition in this MDL:

Q.  Someone says "Don't steal," do you have to put in there "from a supermarket"?

A.  No.

Q.  Someone says "Don't trespass on the property," do you have to put "wearing tennis shoes"?

A.  No.

Q.  Next, you got asked: "Well, you never instructed the companies to keep their files." Do you remember that?

A.  Yes, sir.

Q.  Would old files be important in monitoring—in your ongoing monitoring? Would it be important that a company keep their files so that they can look back at them?

A:  Absolutely. That's the—the whole idea behind maintaining a due diligence file is you have a history of purchases. That way you could see what they're doing and where they're going with their purchases.

148.     For example, it is not an effective control against diversion to identify a suspicious order, ship it, and wait as long as weeks to report it to law enforcement, potentially allowing those pills to be diverted and abused in the meantime.

149.     During a 30(b)(6) deposition in the MDL, the DEA's Unit Chief of Liaison was asked whether the DEA made it "clear to industry that the failure to prevent diversion was a threat to public safety and the public interest." In response, he testified:

Yes, I think it's established in 823 [the Controlled Substances Act] where it's part of our -- part of the registrant that is applying to be a registrant understands that they have to maintain effective controls . . . . they also know that these drugs themselves are scheduled controlled substances for a particular reason, because they're addictive, psychologically and physically they're addictive, so they know that these drugs have these properties within themselves. **So they would understand that these drugs are categorized or scheduled in that manner because they have the potential to hurt**.

150.    In fact, trade organizations in which Hy-Vee actively participated have acknowledged that distributors have been responsible for reporting suspicious orders for more than 40 years. The National Association of  Drug Stores ("NACDS") is a national trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies—from regional s with four stores to national companies. Its members and/or affiliate members also include stakeholders such as manufacturers, other distributors and other trade organizations as well.

151.    Hy-Vee's own Aaron Wiese currently sits on the Board of Directors of NACDS and serves as NACDS Treasurer. Hy-Vee has been a member of NACDS since at least 2013, and potentially earlier given its leadership roles, and has held a position on the Board of Directors for each of those years. In fact, Hy-Vee's own Randy Edeker served as NACDS Chairman in 2015.

152.    As early as 2002, records indicate that Hy-Vee and Industry members were receiving communications from NACDS regarding OxyContin's potential for abuse and potential for diversion, distributed in reaction to rising instances of pharmacy thefts.

153.    In 2006, the NACDS issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs. The Model Compliance Manual notes that a retail pharmacy may "generate and review reports for its own purposes" and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse.

154.    In the appeal that arose from DEA's enforcement action against wholesaler Masters Pharmaceuticals, Inc. for its distribution of opioids, the NACDS submitted a joint amicus brief with a distributor trade organization called the Healthcare Distribution Management Association ("HDMA,") (now known as the Healthcare Distribution Alliance ("HDA")), regarding the legal duty of distributors that acknowledged that "HDMA and NACDS members" had a duty to prevent diversion." *See Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin*., 2016 WL 1321983 (D.C. Cir. April 4, 2016). The NACDS has long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society."

155.    The DEA repeatedly reminded Defendants of their obligations to report and decline to fill suspicious orders. Responding to the proliferation of internet pharmacies that arranged illicit sales of enormous volumes of opioids, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations.

156.    Specifically, in August 2005, the DEA's Office of Diversion Control launched the "Distributor Initiative." The Distributor Initiative did not impose any new duties on distributors, but simply reminded them of their duties under existing law. The stated purpose of the program was to "[e]ducate and inform distributors/manufacturers of their due diligence responsibilities under the CSA by discussing their Suspicious Order Monitoring System, reviewing their [Automation of Reports and Consolidated Orders System ("ARCOS")] data for sales and purchases of Schedules II and III controlled substances, and discussing national trends involving the abuse of prescription controlled substances."[25] The CSA requires that distributors (and manufacturers) report all transactions involving controlled substances to the United States Attorney General. This data is captured in ARCOS, the "automated, comprehensive drug reporting system which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or distribution at the dispensing/retail level—hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions,"[26] described above, from which certain data has now been made public.

157.    As part of the Distributor Initiative, the DEA gave several presentations to distributors both individually and through presentations and discussions at trade groups meetings directly targeted at some of the red flags of diversion that the Defendants were obligated to consider and monitor as part of their requirements under the law.

---

[25] Thomas W. Prevoznik, Office of Diversion Control, Distributor Initiative presentation (Oct. 22, 2013).

[26] U.S. Dept. of Justice, Drug Diversion Administration, Diversion Control Division website, https://www.deadiversion.usdoj.gov/arcos/arcos.html#:~:text=ARCOS%20is%20an%20automat ed%2C%20comprehensive,practitioners%2C%20mid%2Dlevel%20practitioners%2C  (last   visited September 4, 2024).

158.    The DEA has hosted many different conferences throughout the years, including Pharmacy Diversion Awareness Conferences, to provide registrants with updated information about diversion trends and their regulatory obligations. The DEA also frequently presented at various other conferences for registrants at the national, state, and local level.

159.    Through presentations at industry conferences and on its website, the DEA provided detailed guidance to distributors on what to look for in assessing their customers' trustworthiness. As an example, the DEA published "Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances"[27]

160.    In addition, the DEA sent a series of letters, beginning on September 27, 2006, to every commercial entity registered to distribute controlled substances. The 2006 letter emphasized that distributors are:

> one of the key components of the distribution . If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect

---

[27]https://web.archive.org/web/20221023232252/https://www.deadiversion.usdoj.gov/mtgs/pharm
_industry/14th_pharm/levinl_ques.pdf (last visited September 5, 2024)

on the health and general welfare of the American people.[28]

161.    The letter also warned that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[29]

162.    The DEA sent a second letter to distributors on December 27, 2007. Again, the letter instructed that, as registered distributors of controlled substances, they must each abide by statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[30] DEA's letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (e.g., by specifically identifying an order as suspicious, not merely transmitting ARCOS data to the DEA).

163.    In September 2007, the NACDS, (of which Hy-Vee is a member) among others, also attended a DEA conference at which the DEA reminded registrants that not only were they required to report suspicious orders, but also to halt shipments of suspicious orders.

164.    The DEA's regulatory actions against the three largest wholesale distributors further underscore the fact that distributors such as Defendants were well aware of their legal obligations. There is a long history of enforcement actions against registrants for their compliance failures. For example, in 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against three of Cardinal Health's distribution centers, and on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the CSA in Maryland, Florida, and New York. Similarly, on May 2, 2008, McKesson entered into an Administrative Memorandum of Agreement ("AMA") with

---

[28]Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Off. of Diversion Control, Drug Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006), filed in *Cardinal Health, Inc. Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51 ("2006 Rannazzisi Letter"); *see also* CVS-MDLT1000091513; WAGMDL00757797.

[29] *Id.*

[30] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8 ("2007 Rannazzisi Letter").

the DEA related to its failures in maintaining an adequate compliance program. Subsequently, in January 2017, McKesson entered into an AMA with the DEA wherein it agreed to pay a $150 million civil penalty for, inter alia, failure to identify and report suspicious orders at several of its facilities.

165.    The DEA has also repeatedly affirmed the obligations of Defendants to maintain effective controls against diversion in regulatory action after regulatory action.[31] The DEA, among others, also has provided extensive guidance on how to identify suspicious orders and other evidence of diversion.

166.    In addition, red flags are common sense warning signs that have always been an important component of controlled substance pharmacy best practices, not a novel concept to pharmacies. Relevant guidance concerning narcotics dispensing dates back to at least since the 1930's and 1940's. Since then, there has been guidance given to pharmacies and pharmacists related to the creation of systems and programs to guard against diversion and lists of don'ts when dispensing narcotics. DEA enforcement actions such as the *Holiday* decision, *Medicine Shoppe- Jonesborough*, and *United Prescription Services, Inc*. also hold pharmacies responsible for failing to fulfill their corresponding responsibility under the CSA.

167.    The "cocktail" often referred to as the "Holy Trinity" consists of an opioid, a benzodiazepine, and a muscle-relaxer such as carisoprodol. A "trinity" combination can also refer to different combinations of opioid/non-opioid prescriptions intended for abuse and to create a euphoric feeling similar to heroin and other illicit drugs such as fentanyl. Medical literature has long recognized the special dangers posed by cocktails composed of drugs of abuse which lack any documented medical efficacy. Similarly, the *East Main Street Pharmacy* action acknowledged that "the combination of a benzodiazepine, a narcotic and carisoprodol is well known in the pharmacy profession as being used by patients abusing prescription drugs."

---

[31] *See, e.g., Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; 77 Fed. Reg. 62,316 (DEA Oct. 12, 2012) (decision and order); *East Main Street Pharmacy*, 75 Fed. Reg. 66,149 (DEA Oct. 27, 2010) (affirmance of suspension order); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145 (D.D.C. 2012); *Townwood Pharmacy*; 63 Fed. Reg. 8,477 (DEA Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*; 77 Fed. Reg. 44,069 (DEA July 26, 2012) (decision and order); *The Medicine Dropper*; 76 Fed. Reg. 20,039 (DEA April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*; 73 Fed. Reg. 363 (DEA Jan. 2, 2008) (revocation of registration).

168.    As a DEA administrative decision from 2008 explains, "[w]hile carisoprodol [was] not controlled under Federal law, it is controlled under various state laws and is highly popular with drug abusers, especially when taken as part of a drug cocktail that includes an opiate and a benzodiazepine." *See Your Druggist Pharmacy*, 73 Fed. Reg. 75,774, 75,775 n.1 (DEA Dec. 2008). Other DEA and judicial decisions likewise acknowledge well-known and highly abused cocktails. *See, e.g., U.S. v. Evans*, 892 F.3d 692, 706 (5th Cir. 2018).

169.    As described above, red flags indicative of diversion include suspicious behavior of patients, such as stumbling while walking, slurred speech, appearance of intoxication, or of customers coming and appearing like they may not need the medication, or requesting drugs by brand name or street slang such as "blues" (a term referencing Mallinckrodt opioids). Pharmacies' training materials and controls should assist pharmacists and technicians in the identification of such behaviors.

170.    Pharmacies must resolve red flags before a prescription for addictive and dangerous drugs, such as opioids, are dispensed.

### F.    Defendants Worked to Expand their Shares of the Prescription Opioid Market and Failed to Maintain Effective Controls Against Diversion.

171.    For over a decade, all Defendants aggressively sought to bolster their revenues, increase profits, and grow their shares of the prescription opioid market by unlawfully and surreptitiously increasing the volume of opioids they sold nationwide.

172.    However, Defendants are not permitted to engage in a limitless expansion of their market shares through the unlawful sale of highly addictive controlled substances. Rather, Defendants are subject to various duties under the federal CSA and state law—duties they failed to perform.

173.    Defendants failed to provide the requisite controls against diversion. All Defendants shipped suspicious orders with indicia of diversion without performing the required due diligence, and Hy-Vee also dispensed prescriptions with red flag indications of diversion, again without performing the due diligence required by law.

174.    As described further below, the Defendants failed to fulfill their legal duties and instead, routinely distributed and/or dispensed controlled substances while ignoring red flags of diversion and

abuse. The unlawful conduct by these Defendants is a substantial cause for the volume of prescription opioids and the public nuisance plaguing Allamakee County.

### G. Hy-Vee Failed to Guard Against Diversion in Distributing and Dispensing in Allamakee County.

175.     According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. Not all of these prescriptions were legitimate. Yet Hy-Vee systemically ignored that they were fueling a black market, and failed to maintain effective controls against diversion at both the wholesale and retail pharmacy level. Instead, Hy-Vee put profits over the public health and safety. Despite their legal obligations as registrants under the CSA, Hy-Vee allowed widespread diversion to occur—and did so knowingly.

176.     Hy-Vee has operated as a licensed pharmacy wholesaler and facility and as a licensed dispenser. Hy-Ve has distributed and dispensed prescription opioids throughout the United States (particularly in the Midwest), in Iowa, and has dispensed to residents of Allamakee County and/or caused controlled substances to be diverted to Allamakee County.

### 1)  Hy-Vee Was Uniquely Positioned to Guard Against Diversion

177.     Not only do pharmacies such as Hy-Vee often have firsthand knowledge of dispensing red flags – such as distant geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, cash transactions, and other significant information – but they also have the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores. As with other distributors and dispensers, these data points give the pharmacies like Hy-Vee insight into prescribing and dispensing conduct that enables them to prevent diversion and fulfil their obligations under the CSA.

178.     Pharmacies such as Hy-Vee not only make observations through their local front doors, but have extensive data to which an individual pharmacist would not have access. They are uniquely positioned to monitor, for example, the volume of opioids being dispensed in their pharmacies relative to the size of the communities they serve. This is particularly important given that it is recognized that as to the supply of opioids increases, so does the incidence of overdose and death. Hy-Vee could also use this

information to monitor potentially suspicious prescribers. Pharmacies must use the information available to them to guard against supplying controlled substances for non-medical use, identify red flags or potential diversion and should share this information with their agents, as well as provide clear guidance and training on how to use it. A former DEA diversion investigator, whose testimony is also referenced above, agreed in a deposition in this MDL that as part of their obligation under Section 1301.71, pharmacies corporately have an obligation to develop policies to train pharmacists to comply the CSA regulations. She further agreed that the defendants had an obligation to develop and implement systems to provide the necessary tools for their pharmacists to comply with the CSA regulations.

179.    As explained above, in addition to its duties as a distributor, Hy-Vee also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations. Specifically, Hy-Vee had a duty to analyze data and the personal observations of its employees for known red flags such as those described above. Hy-Vee had the ability, and the obligation, to look for these red flags on a patient, prescriber, store, and  level, and to refuse to fill and to report prescriptions that suggested potential diversion.

180.    Hy-Vee was particularly well-positioned to do so given the dispensing data available to it, which it could review at the corporate level to identify patterns of diversion and to create policies and practices to proactively identified patterns of diversion. Hy-Vee could and should have also developed tools and programs to alert its pharmacists to red flags and to guard against diversion.

181.    Hy-Vee had complete access to all prescription opioid dispensing data related to its pharmacies in Iowa, complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in Iowa, including those around Allamakee County, and complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in Iowa, including those around Allamakee County. Further, Hy-Vee had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in Iowa, including those around Allamakee County and complete access to information revealing the size and frequency of prescriptions written by specific doctors across its pharmacies in Iowa, including those around Allamakee County.

182.    Hy-Vee's data is a valuable resource that it could and should have used to help prevent diversion, but it failed to do so. Hy-Vee facilitated the supply of far more opioids than could have been justified to serve a legitimate market. The failure of Hy-Vee to maintain effective controls, and to investigate, report, and take steps to halt orders that it knew or should have known were suspicious, as well as to maintain effective policies and procedures to guard against diversion from its retail stores, breached both its statutory and common law duties.

## 2) Hy-Vee Failed to Guard Against Diversion as a Distributor of Opioids

183.    In both its capacity as a distributor and as a dispenser of controlled substances, Hy-Vee failed to implement effective policies and practices to prevent diversion of opioids in and around Plaintiff's community.

184.    During the time period relative to Plaintiff's claims, including from at least 2006 to 2014, Hy-Vee acted as both a distributor of controlled substances to its own pharmacies and a retailer dispensing controlled substances, Hy-Vee warehoused and self-distributed to the County through its own company-owned distribution centers. Indeed, in 2011, AmerisourceBergen received a subpoena from the DEA identifying "Hy-Vee Warehouse" and its DEA number.

185.    Because it was distributing opioids only to its own stores, it was well-positioned to identify and prevent the diversion of controlled substances. Hy-Vee had access to a trove of information, such as each pharmacy's controlled substance and non-controlled substance ordering and dispensing activities and records, which could provide corporate diversion employees and supervisors with the ability to easily spot deviations from normal ordering patterns. Similarly, Hy-Vee's pharmacy supervisors could have used distribution information, volume and type of controlled substances, and other ordering patterns as warnings that review of individual pharmacy dispensing activity was necessary.

186.    From at least 2006 to 2014, Hy-Vee self-distributed controlled substances. Hy-Vee largely stopped self-distributing controlled substances in or around 2015, but based on ARCOS data, continued to receive shipments of controlled substances from other distributors and dispensed those controlled substances.

187.    For example, and based on ARCOS data available to Plaintiff, at its peak of self-distribution in 2012, Hy-Vee itself distributed 13,584,00 DUs/53,919,894 MMEs of Hydrocodone into Iowa.

188.    But even during the 2006 to 2014 timeframe, including 2012, Hy-Vee supplemented its own self-distribution of opioids with distribution by industry players, including certain industry members. Even if Hy-Vee's distribution center reduced an order to a smaller number of bottles, nothing prevented a Hy-Vee pharmacy from making up the difference by ordering opioids from a third party distributor, such as McKesson or AmerisourceBergen. Not only could Hy-Vee pharmacies place another order with these outside vendors to make up the difference, they could have orders fulfilled by both Hy-Vee and a third party distributor at the same time.

189.    Indeed, in April 2012 email, Amerisource Bergen employee Ed Hazewski pointed out to  a colleague his concerns about Hy-Vee's "erratic buying patterns" and some concerns about Hy-Vee's ability to self-fulfill orders:

> "I have highlighted a couple of Hy-Vee locations on the Hydrocodone sheets that require further discussion. That is based on some erratic buying patterns. I would be interested to know how much their warehouse is distributing to their individual stores. Based on the quantities sold to the warehouse, each individual location[s] would receive on average just over 7,000 tabs of Hydrocodone."

190.    Hy-Vee knew that suspicious order monitoring was required under the CSA and its implementing regulations. In letters referenced above that were sent in September 2006 and December 2007, the DEA reminded industry members, including Hy-Vee—to develop and maintain a SOM system, conduct due diligence on identified suspicious orders, and, if suspicions could not be resolved, cancel the order and report it to the DEA.

191.    Throughout the entire time it self-distributed opioids to its company-owned pharmacies, Hy-Vee lacked detailed operational SOM policies, failed to provide adequate training and guidance to those charged with suspicious order monitoring duties, and limited resources and support to diversion control.

192.    Ultimately, Hy-Vee's distribution system made it nearly impossible for any order to be identified, much less reported, as suspicious. Hy-Vee placed orders of controlled substances from manufacturers and distributors who prioritized sales goals over suspicious order monitoring duties. Hy-Vee also gave significant latitude to its employees to manipulate order size and thresholds. As a result of the company's policies and procedures, Hy-Vee did not-and indeed, could not – identify what was unusual

193.    Hy-Vee also allowed pharmacies to supplement their orders by ordering controlled substances from third party vendors without oversight. This allowed Hy-Vee pharmacies to avoid having their controlled substance orders be monitored or otherwise questioned.

194.    In Allamakee County, Hy-Vee violated the standard of care for a distributor by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

195.    As a vertically integrated distributor and dispenser of prescription opioids, Hy-Vee knew or should have known that an excessive volume of pills was being sold into Iowa and Allamakee County and ultimately, onto the streets. Hy-Vee's activities as a distributor and a seller or dispense of opioids are inextricably linked.

196.    ARCOS data shows that between 2006 and 2019, Hy-Vee received, by far, more opioid shipments than any other chain retail pharmacy in Iowa, particularly in the late 2010s. There is nothing suggesting that this trend has not continued since 2019, and in fact, Hy-Vee may likely have gained market share.

|  | Iowa Total Dosage Units Received (2006-2019) | Iowa Total Milligram Morphine Equivalents Received (2006-2019) |
|---|---|---|
| Hy-Vee | 337,419,206 DUs | 4,628,735,716 MMEs |
| Walgreens | 270,835,988 DUs | 3,506,443,053 MMEs |
| Walmart | 126,182,013 DUs | 1,299,820,516 MMEs |
| CVS | 48,284,063 DUs | 759,234,959 MMEs |

197.    The sheer volume of prescription opioids distributed to and dispensed by Hy-Vee pharmacies in Iowa is indicative of potential diversion and required appropriate due diligence.

198.    Hy-Vee funneled far more opioids into Iowa and the County, and out of its pharmacy doors, than could have been expected to serve legitimate medical use, and ignored other indicia of diversion, including but not limited to suspicious orders.

199.    It cannot be disputed that Hy-Vee was aware of the suspicious orders that flowed from its distribution facilities into its own stores. Hy-Vee simply refused to identify, investigate, and report suspicious orders even though Hy-Vee knew, or should have been fully aware, that opioid it distributed and sold were likely to be diverted. Conversely, Hy-Vee failed to report suspicious orders, failed to meaningfully investigate or reject suspicious orders, and failed to prevent diversion, or otherwise control the supply of opioids flowing into Iowa and the County.

200.    Upon information and belief, Hy-Vee failed to analyze: (a) the number of opioids prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

201.    Hy-Vee was, or should have been, fully aware that the opioids being distributed and dispense by it were likely to be diverted. Yet it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

202.    Given Hy-Vee's retail pharmacy operations, in addition to its role as a wholesale distributor, Hy-Vee knew, or reasonably should have known, about the disproportionate flow of opioids into Iowa and the County and the operation of "pill mills" that generated opioids prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, illicit supply and diversion.

203.    In addition, and upon information and belief, Hy-Vee know, or deliberately turned a blind eye to, its pharmacies' role in diversion of dangerous drugs. At the pharmacy level, discovery will reveal that Hy-Vee knew, or should have known, that its pharmacies in Iowa and the surrounding area, including Illinois, Nebraska, Missouri, and Minnesota, were (a) filling multiple by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions

42

of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were indicative of diversion and abuse. Hy-Vee had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

204.    Because of its vertically integrated structure, Hy-Vee has access to complete information regarding red flags of diversion across its pharmacies in and around the County, but Hy-Vee chose not to utilize this information and failed to effectively prevent diversion.

### 3)    Hy-Vee Failed to Implement Effective Policies and Procedures to Guard Against Diversion from its Retail Stores

205.    At all times relevant herein, Hy-Vee pharmacies sold controlled substances, including FDA Schedule II and FDA Schedule III controlled substances otherwise known as opiate narcotics or opioids.

206.    At all times relevant herein, and as a licensed distributor and dispenser of controlled substances, Hy-Vee held DEA registration(s) and registrations under Iowa law.

207.    As described above, Hy-Vee pharmacies ordered and were supplied opioids from a combination of outside vendors and Hy-Vee's own distribution centers.

208.    Upon information and belief, Hy-Vee lacked meaningful policies and procedures to guide its pharmacy staff in maintaining effective controls against diversion.

209.    Hy-Vee's conduct, and the volume it dispensed in the County thereafter indicates that, to the extent any policies existed, those policies were not consistently and reliably applied. In addition, as discussed further below, Hy-Vee pressured pharmacists to put profits ahead of safety.

210.    Upon information and belief, Hy-Vee jailed to use data held at the corporate level to assist pharmacists in evaluating red flags of diversion

### 4)    Hy-Vee Failed to Guard Against Diversion in Dispensing in the County

211.    Upon information and belief, Hy-Vee pharmacies routinely have dispensed opioids in violation of the Controlled Substances Act and accompanying regulations. Such conduct was a result of

Hy-Vee's lack of robust policies and procedures regarding dispensing controlled substances as well as Hy-Vee's focus on profitability over its legal obligations and public safety.

212.    As a sophisticated chain pharmacy, Hy-Vee had the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Its own data would have allowed Hy-Vee to observe patters or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper or illegitimate prescribing.[32]

213.    Hy-Vee did not use data available to it to effectively comply with its legal obligations to prevent diversion and ensure only legal prescriptions were being filled at its pharmacies.

214.    Upon information and belief, Hy-Vee provided its pharmacists no or limited visibility into the data it collected, thereby depriving them of an invaluable resource when evaluating prescriptions.

215.    Hy-Vee did not make it possible, much less easy, for pharmacists to share information about red flags, suspicious prescribers, and suspicious prescribers, and suspicious patients.

216.    To the extent Hy-Vee did provide its pharmacists with any visibility into the data it collected, Hy-Vee deprived its pharmacists of the ability to meaningfully review and apply this data by making such significant demands on its pharmacists that it effectively prevented them from properly evaluating potential red flags, suspicious prescribers, and suspicious patients.

217.    For example, a current job posting for a "Floating Registered Pharmacist" in a Hy-Vee store in Ankeny, Iowa Hy-Vee store provides an overwhelming list of  "Primary Duties and Responsibilities:"[33]

---

[32] See, e.g., Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195, 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order) DEA  expert witness examined dispensing records alone to identify inappropriately dispensed medications).

[33]  Available  at  https://hyvee.wd1.myworkdayjobs.com/en-US/HyVeeCareers/job/Floating-Registered-Pharmacist_R200735 (last accessed Sept. 11, 2025).

**Floating Registered Pharmacist**



Positions that Report to you: Pharmacy Technician, Pharmacy Clerk, Delivery Person, and Pharmacy students

Primary Duties and Responsibilities:

- Provides prompt, efficient and friendly customer service by exhibiting caring, concern and patience in all customer interactions and treating customers as the most important people.
- Smiles and greets customers in a friendly manner, whether the encounter takes place in the employee's designated department or elsewhere in the store.
- Makes an effort to learn customers' names and to address them by name whenever possible.
- Assists customers by:

  - escorting them to the products they're looking for
  - securing products that are out of reach
  - loading or unloading heavy items
  - making note of and passing along customer suggestions or requests
  - performing other tasks in every way possible to enhance the shopping experience.

- Answers the telephone promptly and provides friendly, helpful service to customers who call.
- Assists with controlled substance inventory on an annual basis or as recommended.
- Assists with inventory control, maintaining inventory levels by ordering and stocking merchandise, checking invoices, and entering inventory information into the computer.
- Assists with coaching, counseling, and training employees; participates in additional education and training.
- Assists HBC manager with ordering and merchandising OTC's.
- Fills and/or verifies prescriptions and counsels patients according to OBRA '90 regulations.
- Assists with reconciliation and balancing of 3rd party accounts.
- Visits schools, doctors' offices, senior centers, etc. to market services.
- Assists with monthly inventory.
- Builds growth and sales through counseling and wellness programs.
- Follows security and regulatory procedures including Quality Assurance Programs.
- Assumes the responsibility for the department in the absence of the pharmacy manager.
- Ensures customers are given prompt and courteous service.
- Maintains a professional appearance, i.e. clean lab coat and name tag.
- Communicates continually with pharmacy manager about any procedural changes, issues, or corporate communications.
- Adheres to company policies and individual store guidelines.
- Reports to work when scheduled and on time.

218.    The laundry list of duties and responsibilities included in the "Floating Registered Pharmacist" posting highlights a pharmacist's role in "building growth and sales," caring for customers, and enhancing customers' shopping experiences, still, the responsibilities list makes no mention of a pharmacists' role in identifying and evaluating potential red flags, suspicious prescribers, and suspicious patients.

219.    In addition, Hy-Vee prioritizes "prompt" and "efficient" customer service, placing emphasis on its pharmacists filling prescriptions as quickly as possible. Indeed, the job description continues, specifying the details of a "fast work pace:"[34]

**Working Conditions:**
This position frequently involves a fast work pace in a retail store setting. Must be able to handle multiple tasks (filling scripts, answering telephone, waiting on customers, etc.) every day. There is an occasional exposure to dangerous chemicals/solvents while compounding products and chemotherapy drugs.

220.    While the job description details that the pharmacist must inspire staff and team work, in reality, many Hy-Vee pharmacists lament publicly that Hy-Vee pharmacists often work without the aid of a pharmacy technician or other staff. When pharmacy technicians are unavailable or pulled away to other areas in the supermarket, Hy-Vee pharmacists are forced to work alone and to act as both pharmacist and technician. This lack of resources or aid impairs a pharmacist's ability to address patient safety and patient care, including his or her ability to evaluate potential red flags, suspicious prescribers, and suspicious patents.

221.    The problem of illegal dispensing caused by Hy-Vee's focus on quickly filling prescriptions and increasing the number of prescriptions dispensed was exacerbated by Hy-Vee's inadequate pharmacy staffing. This greatly cut into the ability of the pharmacist to evaluate each prescription carefully and in accordance with the law.[35]

### H.  Hy-Vee Performance Metrics Put Profits Before Safety

222.    Not only did Hy-Vee lack (and fail to implement) adequate policies and procedures to guard against diversion, but Hy-Vee compounded this problem by implementing performance metrics and prescription quotas for retail stores that contributed to supplying of a black market, including in Iowa and Allamakee County.

---

[34] *Id*.

[35] Some states have tried to outlaw pharmacists from working alone. California, for example, passed a law saying no pharmacist could be required to work alone. Regrettably, however, it has been largely ignored since taking effect in 2019, according to leaders of a pharmacists' union. See Gabler, Ellen, *How Chaos at Chain Pharmacies is Putting Patients at Risk*, THE New YORK TIMES (Jan. 31, 2020).

223.    Hy-Vee had a responsibility to create a work environment that enables its pharmacy staff to detect and prevent diversion, or at the very least does not undermine the ability of staff to carry out these functions or direct emphasis toward increased sales instead of legal compliance.

224.    DEA diversion investigator Demetra Ashley testified that the duty to provide tools to prevent diversion under Section 1301.71 includes providing a work environment that allows pharmacists to fulfill their corresponding responsibility to fill only legitimate prescriptions. She further agreed as to the importance of adequate staffing and testified that both strict time limits that deprived pharmacists of enough time to investigate red flags and requiring quotas on prescriptions filled sounded unreasonable.

225.    Such corporate goals obstruct the performance of pharmacists' professional obligations. There is an inherent conflict between performance metrics that pressure pharmacists to fill certain volume of prescriptions, limit customers' wait time, or base pharmacists' incentive pay on customer satisfaction, on the one hand, and the ability to conduct appropriate due diligence to guard against diversion of controlled substances and refuse to fill illegitimate prescriptions even if a customer is dissatisfied, on the other. Hy-Vee has a duty to maintain a corporate culture that promotes and ensures compliance with the law.

226.    This pressure and focus on profits would not only lead to mistakes, it also would necessarily deter pharmacists from carrying out their obligations to report and decline to fill suspicious prescriptions and to exercise due care in ascertaining whether a prescription is legitimate.

227.    Indeed, "a survey by the Institute for Safe Medication Practices (ISMP) revealed that 83% of the pharmacists surveyed believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, as well as that 49% felt specific time measurements were a significant contributing factor."[36]

228.    In 2013, the National Association of Boards of Pharmacy (NABP), passed a resolution which cited this survey and additionally stated that "performance metrics, which measure the speed and

---

[36] NABP, Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13) (June 5, 2013), https://nabp.pharmacy/news/news-releases/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/ (last visited September 5, 2024).

efficiency of prescription work flow by such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift, may distract pharmacists and impair professional judgment" and "the practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in the pharmacy."[37]

229.    Still, according to a 2016 investigation by the Chicago Tribune, as pharmacies increasingly promote quick service, "pharmacists frequently race through legally required drug safety reviews—or skip them altogether," missing dangerous drug combinations in the process.[38] A pharmacist too rushed to check for a potentially deadly drug interaction is also likely to be too rushed to check for red flags of diversion, such as prescription "cocktails" or other combinations of highly abused drugs.

230.    In reporting on the results of its investigation, the Tribune quoted Bob Stout, president of the New Hampshire Board of Pharmacy, stating that "'They're cutting corners where they think they can cut.'"[39] As the report itself explained: "some pharmacies emphasize fast service over patient safety. Several pharmacists, in interviews, described assembly-line conditions in which staff hurried to fill hundreds of prescriptions a day.[40]

231.    "The National Coordinating Council for Medication Error Reporting and Prevention (NCCMERP), also passed a statement advocating for the "elimination of prescription time guarantees and

---

[37] *Id.*

[38] Sam Roe, Ray Long, and Karisa King, Contract Reporters, *Pharmacies Miss Half of Dangerous Drug Combinations*, Dec. 15, 2016, http://www.chicagotribune.com/news/watchdog/druginteractions/ct-drug-interactions-pharmacy- met-20161214-story.html (last visited September 4, 2024).

[39] *Id.*

[40] *Id.*

a strengthened focus on the clinical and safety activities of pharmacist within the community pharmacy setting."[41]

232.    Public sources demonstrate that an overwhelming number of pharmacist comments, including Hy-Vee pharmacists, reporting that chain pharmacies place profit over safety. A common refrain heard from pharmacists was being asked to do more with less –carrying more responsibilities, and facing increased prescription volumes, while staffing levels have decreased.

## I.    Defendants Worked with Industry Members to Increase Their Profits and Lobbied Against Restrictions on Opioid Use and DEA Enforcement.

229.    Beginning as early as the 1990s, outside distributors, largely through the HDA, began to get together with the  Pharmacies through NACDS to discuss "concerns regarding statutory requirements to report to DEA what are commonly referred to as suspicious orders."

230.    The DEA's suspensions of the registrations of three major distributors in 2007 lit a fuse within the industry.   The very real threat of DEA enforcement prompted a flurry of communications between NACDS members and members of the HDA, described above, as well as the now-notorious Pain Care Forum ("PCF"), a forum run by opioid manufacturers.  A goal of HDA, which it shared with NACDS, was to "develop a comprehensive DEA strategy" to avoid enforcement actions against distributors.

231.    The NACDS and other industry trade groups saw their role in influencing diversion policy as being one that was absolutely critical, considering all that was at stake. At times, these groups adopted militaristic strategies and used terminology ironically similar to the "War on Drugs," developing "task forces" and viewing the DEA's crackdown on distributors and chain pharmacies as an assault on the companies themselves. Only this time, the war was being waged against the very regulatory authorities and

---

[41] National Coordinating Council for Medication Error Reporting and Prevention. Statement Advocating for the Elimination of Prescription Time Guarantees in Community Pharmacy, http://www.nccmerp.org/statement-advocating-elimination-prescription-time-guarantees-  community-pharmacy (last visited September 4, 2024).

government entities fighting to deal with the ever-growing problem of abuse and diversion in this country.

To follow up from last week's Pain Care Forum meeting, NACDS is interested in organizing a Task Force to respond to efforts to reschedule combination hydrocodone products into Schedule II.  At a minimum, NACDS would like to organize to prepare for the October FDA hearing on this topic, but also would like to be prepared for any additional legislation that may be considered.

NACDS has scheduled a conference call to organize the Task Force on July 26 at 10:30 a.m.   The conference call number is:  888-450-5996, pass code: 608936#.  Please email Kevin Nicholson at knicholson@nacds.org  if you are interested in joining the Task Force but have a conflict for that time.

Kevin N. Nicholson, R.Ph., J.D.
Government Affairs and Public Policy
National Association of Chain Drug Stores
Tel: 703-837-4183

232.     Hy-Vee, like the other Defendants, recognized the importance of being able to control and influence trade groups such as the NACDS in the context of influencing policy related to opioid drug abuse and diversion. The efforts taken by the NACDS and other trade groups on behalf of Defendants were so important to their bottom line that Defendants spared no expense in supporting such groups. Hy-Vee held board and/or executive membership positions at least since 2013.

233.     NACDS worked with the HDA, the Alliance to Prevent the Abuse of Medicines ("APAM"), and the PCF to support the Marino Blackburn Bill, also known as S.483 or the "Marino Bill." NACDS, Hy-Vee, and Industry members intended the Marino Bill to "tie the hands" of the DEA to actively and aggressively address diversion and compliance with the CSA."  NACDS worked together with others in the opioid supply  to influence the language in the bill to make it most favorable for them and more restrictive on the DEA.  Notably, masking the influence of industry, when the APAM was asked to sign on to a 2014 letter of support it was "signed by the Alliance, ***not the individual members***."  The final letter that was sent to Senators Hatch and Whitehouse was signed by the members of the Pain Care Forum as well as the Alliance, the NACDS, American Academy of Pain Management, and U.S. Pain Foundation.

234.     The Marino Bill effectively removed the DEA's ability to issue immediate suspension orders regarding manufacturer or distributor registrations.  It also permitted a non- compliant registrant an opportunity to cure its noncompliance before the DEA could take enforcement action and changed the standard upon which revocation occurred.  In the midst of a growing opioid crisis, the Marino Bill removed the most effective deterrent and constrained DEA enforcement actions.  With respect to its efforts to tie the hands of the DEA in its ability to pursue and hold accountable Defendants and other stakeholders for violations of law related to the sale and distribution of prescription opioids, CVS appreciated NACDS's influence.

---

From:       Schlaifer, Marissa C </O=CVSCAREMARK/OU=EXCHANGE ADMINISTRATIVE GROUP
            (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MARISSAC.SCHLAIFER>
To:         Kevin Nicholson
CC:         Eric Juhl; Gibbons, Thomas J.; Burton, Larry
Sent:       10/28/2013 8:27:06 AM
Subject:    RE: No Policy Council Call this Week - Additional Items and Materials

Kevin –

Good work on the changes to the Marino bill.  After reviewing the revised bill, our attorneys identified that it would still require drug testing/background checks of distribution center employees.  So, we'd still prefer that it be limited to new employees only.

Thanks for your work on this!
Marissa

---

235.     Hy-Vee as a member of the NACDS was actively involved in efforts to curb the enforcement power of the DEA in its support of the Marino Bill.  Its history and ties to the HDA and NACDS run deep.

236.     The APAM is a trade group launched in the fall of 2013 and compromised of members of the American Medical Association, Cardinal, CVS, HDMA, Prime Therapeutics and Teva Pharmaceuticals.



237.    Hy-Vee and Industry members used trade groups like the HDA, NACDS and APAM to gain favorable results when it came to regulations and roadblocks that were seen as being in the way of the Defendants ability to capitalize on the opioid business.

238.    In August of 2011, NACDS worked with others on a joint letter opposing DEA fee increases for registrants that were intended to fund the "hir[ing of] more agents and do[ing] more inspections."

239.    HDA's Crisis Playbook, developed in 2013, was a direct response to the "threats" perceived by HDA's members and affiliates to their bottom line: profits derived from the distribution and sale of prescription opioids.  Defendants did and continue to rely on and employ the strategies discussed in the Crisis Playbook. Curiously, there are no slides on how best HDA and its members might work to curb the crisis that is the opioid epidemic.





240.   In 2016, the NACDS Policy Council discussed ongoing efforts to shape opioid legislation, including their success in removing a requirement that pharmacists have to check their state drug monitoring program before filling controlled prescriptions. NACDS also fought regulatory efforts to require Defendants to use available dispensing related data and red flags to prevent diversion, opposing what it described as "recent DEA actions in which DEA is expecting pharmacists to be enforcement agents with respect to prescriptions for pain medications.

241.   NACDS and HDA sought to slow down and impede DEA enforcement activities by requiring the DEA to "work with the [Food and Drug Administration] FDA on all drug diversion issues," ostensibly on the grounds that the DEA's diversion enforcement activities – including "clos[ing] drug distribution centers and pharmacies" and "actions against pharmacies" were harmful in "leading to patients not being able to receive their medications."  This purported concern, however, was industry code for impediments to sales.

242.   NACDS and HDA agreed that the pharmacies should "be more aggressive" and "lead the charge" with respect to certain DEA issues.  NACDS members coordinated regarding pharmacy diversion and "DEA red flags" through a "DEA Compliance Workgroup."  Defendants further used a NACDS "Pharmacy Compliance Roundtable" to discuss avoiding criminal and civil liability for issues related to controlled substances, SOM, and diversion.  And, in May 2012, the NACDS formed a Policy Council "Task Group" to "discuss issues and develop strategies" concerning "ongoing problems that NACDS members are having with DEA enforcement actions," through which it sought to influence the government and media set meetings with legislators seeking to "address the problems with DEA actions," and "collaborate with, and support others' efforts" including HDA.

243.   NACDS members coordinated regarding pharmacy diversion and "DEA red flags" through a "DEA Compliance Workgroup."  Defendants further used a NACDS "Pharmacy Compliance

Roundtable" to discuss avoiding criminal and civil liability for issues related to controlled substances, SOM, and diversion. And, in May 2012, the NACDS formed a Policy Council "Task Group" to "discuss issues and develop strategies" concerning "ongoing problems that NACDS members are having with DEA enforcement actions," through which it sought to influence the government and media' set meetings with legislators seeking to "address the problems with DEA actions," and "collaborate with, and support others' efforts" including HDA.

### J. Defendants Worked with Industry members, Opioid Manufacturers, and Particularly Purdue, to Promote Opioids and Improperly Normalize Their Widespread Use.

244. Industry pharmacies such as Hy-Vee not only failed to check the oversupply of opioids by violating laws and ignoring available safety measures, they were also a critical participant in the manufacturers' and distributors' campaign to create a sea change in the way opioid were utilized in the United States. This campaign included spreading false messaging about the addictive nature of prescription opioids, creating the false perception that opioids should be widely utilized, actively promoting widespread opioid utilization, improperly increasing opioid sales beyond legitimate uses, and dismantling and undermining the last line of defense that was supposed to exist at the pharmacy level.

245. As Purdue astutely recognized, industry pharmacies, including Hy-Vee and certain Industry members, were critical to the campaign to promote prescription opioids, noting in internal documents:

> The pharmacist plays a vital role in pain management, as they are the last piece of the puzzle in getting patients prescriptions filled. If the pharmacist is not educated in the use of OxyContin or has any misconceptions about the use of opioids, it can result in a prescription not getting filled and a patient suffering from needless pain.
> The pharmacist is the ultimate gate keeper. At times, they can make or break the effective use of Oxycontin. We are running into several cases of legal and regulatory issues, which has resulted in counter detailing of Oxycontin. Much of this is borne out of ignorance.
> The absolute last thing we want is for the OxyContin prescription to be bounced out at the pharmacy level because of unfounded fears from the "uneducated" pharmacist.

246.    Instead of playing the critical gatekeeper role that the pharmacies were supposed to play, they instead helped open the floodgates of dangerous opioid narcotics flooding into communities like the County.   The pharmacies participated in the multi-faceted campaign to spread misinformation about opioids and improperly increase the utilization and supply of opioids including by:

      a.      Spreading false messages to pharmacists and patients through provider and patient "education" campaigns designed to improperly normalize widespread use of opioids;

      b.      Direct marketing of opioids to patients, pharmacists and healthcare providers;

      c.      In-store advertisements and advertising campaigns designed to drive sales of prescription opioids;

      d.      Use of financial incentives such as coupon programs, rebate programs, and loyalty programs designed to drive opioid sales; and

      e.      Driving the sale of opioid products through patient adherence programs designed to generate long-term opioid use.

247.    Starting in the 1990s, opioid manufacturers created a carefully orchestrated campaign to change the utilization of prescription opioids in the United States.  Pharmacies played a critical role in that campaign.  Indeed, for that campaign to work, the thousands of pharmacists employed by pharmacies and the patients they serviced had to be conditioned to accept the sea change in the use of opioids and be "re-educated" about their dangers.  In order for prescription opioids to achieve the blockbuster sales that occurred, their widespread had to be normalized not only with doctors but also with patients and pharmacists.

248.    Defendants worked as partners and conduits to spread the misinformation campaign orchestrated by opioid manufacturers to pharmacists and patients across the country, including the false messaging surrounding the use of opioids for the treatment of chronic pain and the true addictive nature of opioids, all in an effort to increase profits for all stakeholders.

249.    For example, as early as 2001, CVS worked closely with Purdue and its un-branded

56

marketing arm, Partners Against Pain ("PAP") to "fight back" against allegations (later proved to be true) that Purdue's Oxycontin was being abused at alarming rates. It was Purdue's Partner's Against Pain website that Purdue, and its "Partners," including CVS, utilized to make the claims that the risk of addiction associated with Oxycontin was very small.



250.     Purdue worked together with CVS to ensure that CVS's own pharmacists were trained by Purdue on many of the misleading marketing messages that would later form the basis for a 2007 criminal guilty plea and $600 million fine between Purdue and the Department of Justice for misleading regulators, doctors, and patients about Oxycontin's risk of addiction and its potential for abuse. CVS's

ties to PAP were so deep that CVS even went so far as to put CVS's logo communications from its "partner."



**CVS/pharmacy**

June 2001

Dear CVS Pharmacists:

CVS is proud to participate in Partners Against Pain®, a therapeutic alliance of pharmacists, physicians, nurses, and pain experts, sponsored by Purdue Pharma. We acknowledge the legitimate concern of pharmacists over the diversion of opioid medications.

That's why we recently developed, and have enclosed, "How to Stop Drug Diversion & Protect Your Pharmacy." Included in this guide are such helpful tips from the U.S. Drug Enforcement Administration, such as:

- How to detect prescriptions that have been "rinsed" blank and rewritten
- Confirming prescriptions using a published phone number – not the number on the prescription – if you have doubts about any aspect of it

Treating people in pain is a top priority. Purdue is a leader in educating the healthcare community on effective pain management and the appropriate use of pain medicines. Why? Because we believe that education and open communication are keys to effective pain control.

Along with hundreds of educational programs and brochures, Partners Against Pain sponsors the award-winning website – www.partnersagainstpain.com – which provides pain information, assessment tools, and support – 24 hours a day. We hope you and your customers will visit this site, and that the enclosed brochure will help you in your efforts to serve your customers and protect your pharmacy from drug diversion.

Provide the right patients, with the right pain medicine, at the right dosage, under the right supervision. Together, let's treat the pain. Please share a copy of this letter with your technician.

Sincerely,

Dr. Robert F. Reder, V.P.
Medical Affairs & Worldwide Drug Safety
Purdue Pharma L.P.

cc:  Philip Keough, R.Ph.
     Director, Pharmacy Operations

     Sharon Galzarano, R.Ph.
     Manager, Professional Practices

Barry Jasilli, R.Ph., JD
Director, Quality Improvement
CVS Corporation

Susan DelMonico, R.Ph., JD
Director, Regulatory Compliance
CVS Corporation

One Stamford Forum, Stamford, Connecticut 06901-3431  Telephone (203) 588-5000  Fax (203) 588-5850
www.partnersagainstpain.com

251.    CVS was so eager to ally itself with Purdue and its profits that it solicited Purdue for its participation in co-hosting Continuing Education programs for healthcare providers and pharmacists regarding training on diversion of prescription opioids.



*Request for Support:*
*CVS "Quality First™ Communication Skills"*
*Continuing Education Program*

Over the last decade, and continuing today, pharmacy practice has evolved dramatically. As part of this evolution, we have witnessed a pharmacist's role change from one of a dispenser of products to that of a supplier of information, deliverer of medication, clinical reviewer of drug therapy, and even disease state manager.  In order to be prepared for this enhanced role, we must continue to educate our pharmacists on the importance of superior communication skills, especially in light of new, often aggressive therapies, including that of pain management therapy.  These communication skills are not limited to patients, and apply just as significantly to interactions with other health care professionals. We all recognize the challenges that often accompany community practice, and thus we must also educate pharmacists and technicians on topics that include time efficient patient counseling, and even conflict resolution.

We have always enjoyed a positive relationship with Purdue Pharma, and most recently our productive and pleasant interactions with Mr. Stephen Seid and Mr. Donald Tasser, have allowed us to work together to share the informational brochure entitled *"How to Stop Drug Diversion, and Protect Your Pharmacy"* with our pharmacists.  This joint initiative was advantageous to both of our organizations.  Based on this success, and our productive history with Purdue, we are offering what we believe will be another mutually beneficial opportunity.  As part of our Quality First™ program, a comprehensive program that addresses quality related issues, we are hosting a series of Continuing Education sessions for our pharmacists.  This series will contribute significantly to our strategic business goals, and thus we anticipate nearly 100% attendance by our pharmacists.  This program is considered a critical part of our business plan, and thus we'll be presenting and promoting it at our annual Operations/Marketing Conference in Nashville, this September.

In Nashville, our Regional Healthcare Managers (who are all pharmacists) will be trained by Dr. Daniel Teat, of Campbell University School of Pharmacy, who has designed a multiple-hour Communication and Conflict Resolution CE program, and Barry Jasilli, R.Ph., J.D.  Dr. Jasilli has produced a three-hour CE that addresses prescription accuracy. Incorporated into the CE would be examples (role playing opportunities) of how to handle situations which are often associated with Purdue's products.  By way of example: how to communicate effectively with patients and physicians about appropriate pain management therapy, and how to resolve potential conflict with a drug "seeker".

252.    Starting in at least 1999, Purdue sponsored Walgreens's Pharmacy continuing education programs designed to encourage stores to "get on the Pro Pain Management Band Wagon." Purdue was thrilled with the response and assistance it received from Walgreens when Purdue presented on "Pain Management for the Pharmacist." At the beginning of each Purdue sponsored meeting, a Walgreens pharmacist made a presentation on his store and the program implemented.  His store actively advertised to area doctors and patients that they were a "full- service" pain management pharmacy.  This service included providing a list to physicians' offices of all CIIs they had in stock (and they had everything),

60

accepting "verbal orders" for Class II analgesics prior to presentation of the original prescription at the store to decrease "waiting time", allowing partial fills on CII prescriptions in terminal patients, and accepting after hours "emergency CII prescriptions" without a hassle.  Purdue praised the pharmacist's actions as "fantastic."

253.    Rite Aid also helped to expand the market and increase the demand for prescription opioids by working in concert with manufactures like Purdue. Capitalizing on Rite Aid's reach, Purdue worked with Rite Aid as early as 2001 to promote its highly addictive, OxyContin.  The return on investment ("ROI") of such a program was clear to both Purdue and Rite Aid, as described below.

> **To:**    Stup, Sharlene
> **Cc:**    Geiwitz, Dr. Allen; Terifay, Terrence
> **Subject:**    Rite Aid Program
>
> Sharlene:
>
> I wanted to follow up regarding today's pharmacy program with Dr. Al Geiwitz at the Rite-Aid Corporate Office. Dr. Al addressed in great detail an overview of pain management, the JCAHO pain standards, and most importantly the abuse and diversion issues.  Dr. Al's discussion was well received and greatly appreciated by all in attendance, especially John Boyle, Regional Pharmacy Development Manager.
>
> Our ROI will best be defined by John, whose regional coverage extends to over 120 stores in Northeast Philadelphia, North Philadelphia, Mt. Airy, Bucks County, and other outreaches within our district.  This is of great importance because prior to this program, John and many other pharmacists had concerns with regulatory issues surrounding purchasing quantities of OxyContin and identifying appropriate patients.  Now, John has made himself available as an advocate and is willing to assist in our efforts in proper pain management education.
>
> Sharlene, I am personally pleased with the efforts put forth by myself regarding this program.  As you know, Rite-Aid has presented numerous challenges to the Philadelphia District in the past.  I believe that by creating the need for proper education, I have the opportunity to make significant progress with the key Rite-Aid pharmacies in my territory.
>
> Sincerely,
> Heather

Both Purdue and Rite Aid recognized the importance of a  pharmacy and pharmacist in the efforts to expand and sustain the demand for prescription opioids. As the last line of defense, "[Purdue's]

pharmacists at the retail level" were the "most important audience. . . in highly sensitive areas" – presumably those already impacted, even in 2001, by the opioid epidemic.

```
    -----Original Message-----
From:      Lombardo, Ralph
Sent:      Wednesday, April 18, 2001 10:29 PM
To:        Cook, Dr. Mary; Geiwitz, Dr. Allen; Cramer, Phil
Cc:        Richards, Tim; Gasdia, Russell; DaBronzo, Dr. Joseph
Subject:   FW: Rite Aid Program

                   I want to thank Dr. Al, Dr. Mary Cook and Dr. Dabronzo for supporting
    our efforts in the Philadelphia area. This paid off.  I received a voice mail today from Heather
    Peterson through Sharlene Stup informing us the Rite Aid DM asked her to be there today to do
    inservices for 25 more pharmacists and arranged for her to come back in the near future to
    address the rest of the pharmacists who were unable to attend.  Our pharmacists at the retail
    level may be our most important audience right now, especially in the highly sensitive areas.


    Thanks again

    Ralph
```

254.    Kroger welcomed Purdue's marketing into its stores.  Following an NACDS conference, a Purdue employee described Kroger's Pharmacy Procurement Manager in attendance as "very positive as to what Purdue is doing" and "interested in doing programs . . . a regional level," with Purdue's "various brochures included."  He also described making another new contact at Kroger, who had agreed to send Purdue's brochure and letter out electronically.  An "account contact report" from Purdue further described the results of communication with Purdue's Pharmacy Category Manager, who "was very supportive and understanding" about Purdue's "ongoing OxyContin media battle" in 2001.  Not only would Purdue's "Pharmacy brochure and letter" be sent out to all Kroger Pharmacy Directors in each division — when Kroger's employee's "co-sign the letter" it would have "better impact."  Purdue would also send out its continuing education ("CE") programs on pain management.

255.    Similarly, Walmart teamed up with Purdue to spread misinformation about prescription opioids.  As early as 1995, Purdue and Walmart launched presentations utilizing pro- opioid key opinion leaders to pharmacists across the country.  As Purdue described: "The Program [on pain management] will originate from Walmart's Studios in Bentonville, AR and sent by satellite to more than 2,000 stores across the country.  It is expected that as many as 4,000 pharmacists and district managers will either attend the

session or view the video tape."

256.    Hy-Vee was no exception to joining in the  campaign and allying itself with Purdue and Industry members. In September 1999, Purdue hosted two separate "Pain Management for Pharmacists" lecture events  for a combined forty Hy-Vee Pharmacy Managers in Des Moines, Iowa.   The two programs were listed to be "for Hy-Vee Chain Pharmacy Educational Program." Speaker Dr. Mary Cook led the programs on behalf of Purdue, the same Dr. Cook who worked on behalf of Purdue to promoted Purdue's efforts at RiteAid stores in the Philadelphia area.

257.    In 2007, Hy-Vee and 17 other pharmacy chains joined Walgreens, Wal-Mart, CVS, and Albertsons, among many others, to directly participate in the "OxyContin® Tablets/MS Contin® Tablets Coupon Program." This program, run by Purdue and its vendor "Therapy First," was designed to drive OxyContin and MS Contin sales nationwide.

258.    Pharmacies coordinated marketing efforts to their pharmacists and staff regarding opioids at trade shows and through email blasts, mailers, and brochures to promote the idea that opioids were safe for widespread utilization, that pain was undertreated, and the appropriate treatment of pain were opioid drugs.

259.    Opioid manufacturers paid pharmacies, including Hy-Vee, to conduct internal marketing to pharmacists and pharmacy staff. For example, internal documents from Janssen illustrate the reach the pharmacies could offer for opioid manufacturers' marketing messages:

# *Walgreens Communication Program*

## Walgreens

**Purpose:** The program is designed to provide a communication mechanism for pharma mfg. to distribute key changes to their products to our store pharmacists and technicians.

**Audience:** Walgreens store pharmacists and Technicians.

**Services:** The program has two components. First, ¼ to 1/3 page message will be placed one time in the weekly pharmacy update that is distributed to all of Walgreens retail stores. Second, a 2 page monograph will be posted on storenet, Walgreens Intranet for pharmacist and technician reference for 6 months.

**Development:** WHS Clinical team will develop both the key message for the stores and the 2 page monograph. The manufactures will be responsible for providing information to WHS that will be used to develop the messages to go into the weekly pharmacy update and intranet overview. Manufacturers will be able to review message before sending to the field.

**Price:** The fee for the service is $15,000 to be paid net 30 days after communication is posted in the weekly update.

Breakdown of expenses:        $5,000 for development

## Rite Aid Communication Programs

**Virtual Trade Show** is an internet portal that is available to over 30,000 pharmacy associates. This portal will serve as the access point for viewing pharmaceutical manufacturer promotional videos that detail current products. Each month a select group of manufacturer videos will be made available for pharmacy associate viewing. Each video can contain up to four minutes of content with the option to include multiple products. Each video segment will be followed by a manufacturer-provided questionnaire to confirm content understanding. Upon completion of each video segment, the associate will receive one credit towards an entry into a monthly drawing for select giveaways. To qualify for credits the videos need to be watched by the end of the designated month. Completion of a manufacturer-supplied quiz will be required to receive credit for watching each video. Videos will be made available for repeat viewing for 90 days post-publication.

**Medication Minute** - Rite Aid Drug Information Center publishes a monthly Clinical Update with unbiased, factual and relevant news and timely educational themes for their stores. Also offered to manufacturer is a Clinical Update Special Product Edition. This publication addresses awareness of a therapy issue or change in strategy which is critical to a manufacturer during launch or when a new feature or result is discovered.

**Product Announcement (Electronic)** - Product specific message sent electronically to all dispensing Rite Aid Pharmacists (full and part-time) and Pharmacy Field Management to communicate important product information. The product description, NDC number, pack size, Rite Aid order number, AWP price, information regarding availability, stocking and/or distribution and a brief note of the product use would be included.

260.    These are but some examples.  Since acting as a key participant in the expansion of the market and normalization of prescription opioids in the 1990s and 2000s, for decades, pharmacies, including Hy-Vee, continued to offer "education" programs designed to grow and maintain the market for prescription opioids by changing perceptions of pharmacists and staff so that the "last line of defense" to increased opioid supply would be relaxed and sales would occur without restriction.

261.    This pervasive misinformation campaign was critical to the dramatic shift in the way opioids were utilized in the United States and was a key factor in creating the dramatic oversupply of opioids into the United States and Plaintiff's community.  Pharmacies, including Hy-Vee, played a key role in that campaign.

### K.    The Opioids the Defendants Sold Migrated into Other Jurisdictions

262.    As the demand for prescription opioids grew, fueled by their potency and purity, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

263.    First, prescriptions written in one state may, under some circumstances, be filled in a different state. But even more significantly, individuals transported opioids from one jurisdiction specifically to sell them in another.

264.    When authorities in states such as Ohio and Kentucky cracked down on opioid suppliers, out-of-state suppliers filled the gaps. Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills. Residents of Iowa and other states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists."

265.    The facts surrounding numerous criminal prosecutions illustrate the common practice. For example, one man from Warren County, Ohio, sentenced to four years for transporting prescription opioids from Florida to Ohio, explained that he could get a prescription for 180 pills from a quick appointment in West Palm Beach, and that back home, people were willing to pay as much as $100 a pill—ten times the pharmacy price. In Columbus, Ohio, a DEA investigation led to the 2011 prosecution of sixteen individuals involved in the "oxycodone pipeline between Ohio and Florida."126 When officers searched the Ohio home of the alleged leader of the group, they found thousands of prescriptions pills, including oxycodone and hydrocodone, and $80,000 in cash. In 2015, another Columbus man was sentenced for the same conduct—paying couriers to travel to Florida and bring back thousands of prescription opioids, and, in the words of U.S. District Judge Michael Watson, contributing to a "pipeline of death."127

266.    Outside of Atlanta, Georgia, four individuals pled guilty in 2015 to operating a pill mill;

66

the U.S. attorney's office found that most of the pain clinic's customers came from other states, including North Carolina, Kentucky, Tennessee, Ohio, South Carolina, and Florida.

267.    When authorities in states such as Ohio and Kentucky cracked down on opioid suppliers, out-of-state suppliers filled the gaps. Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills. Residents of Ohio and other states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists."

268.    The facts surrounding numerous criminal prosecutions illustrate the common practice. For example, one man from Warren County, Ohio, sentenced to four years for transporting prescription opioids from Florida to Ohio, explained that he could get a prescription for 180 pills from a quick appointment in West Palm Beach, and that back home, people were willing to pay as much as $100 a pill—ten times the pharmacy price. In Columbus, Ohio, a DEA investigation led to the 2011 prosecution of sixteen individuals involved in the "oxycodone pipeline between Ohio and Florida."[42] When officers searched the Ohio home of the alleged leader of the group, they found thousands of prescriptions pills, including oxycodone and hydrocodone, and $80,000 in cash. In 2015, another Columbus man was sentenced for the same conduct—paying couriers to travel to Florida and bring back thousands of prescription opioids, and, in the words of U.S. District Judge Michael Watson, contributing to a "pipeline of death."[43]

269.    Outside of Atlanta, Georgia, four individuals pled guilty in 2015 to operating a pill mill;

---

[42] *16 Charged in 'Pill Mill' Pipeline*, Columbus Dispatch (June 7, 2011), http://www.dispatch.com/content/stories/local/2011/06/07/16-charged-in-pill-mill-pipeline.html.

[43] *Leader of Ohio pill-mill trafficking scheme sentenced*, Star Beacon (July 16, 2015), http://www.starbeacon.com/news/leader-of-ohio-pill-mill-trafficking-scheme-sentenced/article_ 5fb058f5-deb8-5963-b936-d71c279ef17c.html.

the U.S. attorney's office found that most of the pain clinic's customers came from other states, including North Carolina, Kentucky, Tennessee, Ohio, South Carolina, and Florida.

270.    Another investigation in Atlanta led to the 2017 conviction of two pharmacists who dispensed opioids to customers of a pill mill across from the pharmacy; many of those customers were from other states, including Ohio and Alabama.

271.    In yet another case, defendants who operated a pill mill in south Florida were tried in eastern Kentucky based on evidence that large numbers of customers transported oxycodone back to the area for both use and distribution by local drug trafficking organizations. As explained by the Sixth Circuit in its decision upholding the venue decision, "[d]uring its existence, the clinic generated over $10 million in profits. To earn this sum required more business than the local market alone could provide. Indeed, only about half of the [Pain Center of Broward]'s customers came from Florida. Instead, the clinic grew prosperous on a flow of out-of-state traffic, with prospective patients traveling to the clinic from locations far outside Ft. Lauderdale, including from Ohio, Georgia, and Massachusetts."[44] The court further noted that the pill mill "gained massive financial benefits by taking advantage of the demand for oxycodone by Kentucky residents."[45]

272.    The route from Florida and Georgia to Kentucky, Ohio, and West Virginia was so well traveled that it became known as the "Blue Highway," a reference to the color of the 30mg Roxicodone pills manufactured by Mallinckrodt. Eventually, as police began to stop vehicles with certain out-of-state tags cruising north on I-75, the prescription tourists adapted. They rented cars just over the Georgia state line to avoid the telltale out-of-state tag. If they were visiting multiple pill mills on one trip, they would stop at FedEx between clinics to mail the pills home and avoid the risk of being caught with multiple prescriptions if pulled over.  Or they avoided the roads altogether:  Allegiant Air, which

---

[44] *United States v. Elliott*, 876 F.3d 855, 858 (6th Cir. 2017).

[45] *Id.* at 861.

offered several flights between Appalachia and Florida, was so popular with drug couriers that it was nicknamed the "Oxy Express."[46]



273.    While the I-75 corridor was well utilized, prescription tourists also came from other states.  The director of the Georgia drugs and narcotics agency observed that visitors to Georgia pill mills come from as far away as Arizona and Nebraska.

274.    Similar pipelines developed in other regions of the country.  For example, the I-95 corridor was another transport route for prescription pills.  As the director of the Maine Drug Enforcement Agency explained, the oxycodone in Maine was coming up extensively from Florida, Georgia and California.  And according to the FBI, Michigan plays an important role in the opioid epidemic in other states; opioids prescribed in Michigan are often trafficked down to West Virginia, Ohio, and Kentucky.

275.    Abundant evidence, thus, establishes that prescription opioids migrated between cities,

---

[46] *Id.*; *see also* Andrew Welsh-Huggins, *States Take on 'Tourists' Trafficking Painkillers,* Republican Herald (July 9, 2012).  Note that Interstate 75 is also called the "Oxy Express"; for example, the Peabody Award-winning documentary by that name focuses on the transport of prescription opioids along I-75.  https://www.youtube.com/watch?v=wGZEvXNqzkM.

69

counties, and states, including into Ohio from West Virginia, Kentucky, Illinois, Iowa, Georgia, and Florida. As a result, prescription data from any particular jurisdiction, including Iowa, does not capture the full scope of the misuse, oversupply and diversion problem in that specific area. As the criminal prosecutions referenced above show, if prescription opioid pills were hard to get in one area, they migrated from another. The distributors were fully aware of this phenomenon and profited from it.

L. **The Defendants Conspired to Engage In The Wrongful Conduct Complained Of Herein and Intended To Benefit Both Independently and Jointly From Their Conspiracy.**

276.    In addition, and on an even broader level, Hy-Vee took advantage of the industry structure, including end-running its internal checks and balances, to their collective advantage. Hy-Vee and Industry members agreed among themselves to increase the supply of opioids and fraudulently increase the quotas that governed the manufacture and supply of prescription opioids. Hy-Vee and Industry members did so to increase sales, revenue, and profit from their opioid products.

277.    The interaction and length of the relationships between and among Hy-Vee and Industry members reflects a deep level of interaction and cooperation between Defendants in a tightly knit industry. Hy-Vee and Industry members operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

278.    Hy-Vee and Industry members collaborated to expand the opioid market in an interconnected and interrelated network in the following ways, as set forth more fully below, including, for example, membership in the NACDS and HDA.

279.    Hy-Vee utilized their membership in the NACDS and HDA and other forms of collaboration to form agreements about their approach to their duties under the CSA to report suspicious orders. Hy-Vee and Industry members overwhelmingly agreed on the same approach—to fail to identify, report or halt suspicious opioid orders, and fail to prevent diversion. Hy-Vee and Industry members' agreement to restrict reporting provided an added layer of insulation from DEA

scrutiny for the entire industry were thus collectively responsible for each other's compliance with their reporting obligations. Hy-Vee and Industry members were aware, both individually and collectively, of the suspicious orders that flowed directly from Hy-Vee and Industry members' facilities.

280.    Hy-Vee and Industry members knew that their own conduct could be reported by others and that their failure to report suspicious orders they filled could be brought to the DEA's attention. As a result, Hy-Vee and Industry members had an incentive to communicate with each other about the reporting or suspicious orders to ensure consistency in their dealings with DEA.

281.    Hy-Vee and Industry members also worked together to ensure that the opioid quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had not basis for refusing to increase or decrease production quotas due to diversion.

282.    The desired consistency, and collective end goal was achieved. Hy-Vee and Industry members achieved blockbuster profits through higher opioid sales by orchestrating the unimpeded flow of opioids.

**V.   Iowa-Specific Facts**

  **A.   Hy-Vee Breached its Duties in Iowa and the County.**

283.    Hy-Vee distributed and dispensed opioids in Iowa and failed to meet its regulatory obligations while doing so.

284.    In addition to the duties imposed by federal law, under Iowa law, those who distribute opioids have a duty to detect, investigate, refuse to fill or ship, and report suspicious orders of opioids. And pharmacies who dispense opioids are required to refuse to fill and report prescriptions that have indicia of diversion as well, including those that are distributed or dispensed other than for a medical purpose.

71

285. To that end, the Iowa Pharmacy Board requires that persons registered to manufacture, distribute, dispense, or administer controlled substances under this chapter shall monitor registrant's abilities to establish and maintain effective controls against diversion, comply with applicable state and local laws, and keep records and maintain inventories in conformance with the recordkeeping and inventory requirements of federal law and with such additional rules as may be issued by the board." I.C.A. §§ 124.303 and 124.306; 21 C.F.R. § 1301.74 (imposing duty to monitor, detect, investigate, refuse to fill, and report suspicious orders under federal law).

286. Defendants were required by Iowa law to operate in compliance with federal laws, including the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* I.C.A. § 124.306.

287. As distributors and pharmacies, Defendants also have duties under Iowa law. The obligations imposed under the Iowa Code imposes obligations and duties upon "registrants," to "keep record and maintain inventories in conformance with the recordkeeping and inventory requirements of federal law". I.A.C. § 124.306. As pharmacies, Defendants are also included in the definition of "Practioner," see 124.101(27), meaning Defendants also have duties to comply with dispensing requirements outlined in I.A.C. § 124.308, as well as the detailed recordkeeping requirements of I.A.C. § 124.306.

288. All distributors, including Hy-Vee when acting in that role, also have a duty to know their customers and the communities they serve. To the that, through this process of customer due diligence, a distributor observes suspicious circumstances—such as cash transactions or young and seemingly healthy patients filling prescriptions for opioids at a pharmacy they supply—those observations can also trigger reasonable suspicion. A single order can warrant scrutiny, or it may be a pattern of orders, or an order that is unusual given the customer's history or its comparison to their customers in the area. Thus, in addition to their duties as distributors, pharmacies also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy

72

operations. Pharmacies had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

289.    Hy-Vee knew, or should have known, that their pharmacies in Iowa, and the surrounding area, including Illinois, Nebraska, Missouri, and Minnesota, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Hy-Vee had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

290.    Defendants were required by Iowa law to operate in compliance with federal laws, including the federal CSA, 21 U.S.C. § 801 *et seq*. and its implementing regulations.

291.    A number of Iowa counties had an opioid prescription rate exceeding their population for extended periods of time.

292.    Defendants either were on notice, or should have been on notice, that the diversion of opioids was likely occurring in Iowa communities, should have investigated, ceased filling orders for opioids, and reported potential diversion.

293.    In addition, the increase in fatal overdoses from prescription opioids has been widely publicized for years.  Iowa has faced a spike in fatal overdoses, the majority of which are attributable

to prescription opioids or the illicit opioids that patients often began abusing after becoming addicted to prescription opioids.  The CDC estimates that for every opioid-related death, there are 733 non-medical users. Defendants had every reason to believe that illegal diversion was occurring in Allamakee County.

294.    Defendants had information about suspicious orders that they did not report, and also failed to exercise due diligence before filling orders from which drugs were diverted into illicit uses in communities across Iowa.

295.    Defendants disregarded their reporting and due diligence obligations under federal law and Iowa law.  Instead, they consistently failed to report or suspend suspicious orders, deepening the crisis of opioid abuse, addiction, and death in Iowa.

296.    Defendants participated in growing the market for prescription opioids in the United States and in Iowa far beyond reasonable limits, and fueling the improperly expanded market with opioids. In addition, as competing industry members scaled back their distribution and dispensing of opioids in response to the crisis, Defendants took on their market share and maintained or increased opioid distribution and dispensing levels.

**B.**  The Devastating Effect of the Opioid Epidemic in Iowa

297.    By helping to improperly inflate the opioid market, continuing to fill and failing to report suspicious orders of opioids, and by continuing to dispense opioids and "cocktails" of opioids and other drugs despite indicia of diversion, Defendants have contributed to an oversupply of opioids in Iowa generally, and in Allamakee County specifically. This oversupply allowed non-patients to become exposed to opioids, and facilitated access to opioids for both patients who could no longer access or afford prescription opioids and individuals struggling with addition and relapse. Defendants had financial incentives to sell higher volumes of opioids and not to report suspicious orders or guard against diversion, and to dispense opioids despite indicia of diversion.

74

298.    The rate of opioid use deaths in Iowa over the last two decades has grown slightly or remained relatively stable.[47]



299.    From 2018 to 2023, the number of opioid-involved overdose deaths occurring in Iowa trended upward. There was a peak in 2021 of 255 opioid-involved deaths.

300.    As of 2024, Midwest High Intensity Drug Trafficking Areas Program (HIDTA) continued to report the growing presence of opioids in drug overdose deaths in Iowa. Concurrently with the below chart, HIDTA reported that "any opioid deaths increased 75% (136 to 238) from 2018 to 2023; 77.2% of these were synthetic opioids (950 of 1,230).[48]

---

[47] Understanding the Opioid Crisis in Rural and Urban Iowa, Iowa State University, January 2019, available at https://icash.public-health.uiowa.edu/wp-content/uploads/2019/03/ISU-Opioid-pub-SOC3088.pdf (last accessed September 14, 2025)
[48] https://img1.wsimg.com/blobby/go/893a8d74-0308-463e-b5f2-5dc56ff67d71/downloads/c8da8ba2-e5ec-4474-be91-37fba0685e82/Midwest%20HIDTA%20Iowa%20Overdose%20Report%20-%202024.pdf?ver=1757346780339 (last accessed September 14, 2025)



301.    HIDTA also observed that groups which traditionally solely distributed methamphetamine, were transitioning to become poly-drug distributors, expanding to the distribution of counterfeit oxycodone tablets containing fentanyl.

302.    Meanwhile, in 2023, the Iowa Board of Pharmcy issued its 2022 Annual Report on its PMP (Prescription Monitoring Program) which reported that of the Top 10 Schedule II-IV Drugs By Dosage Units Dispensed in 2018, three of the top four scheduled drugs were opioids, and opioids comprised 49% of controlled substance prescriptions dispensed in the state.[49]

---

[49] Iowa Board of Pharmacy, 2022 Annual Report (PMP), February 1, 2023.
https://dial.iowa.gov/media/7115/download?inline (last accessed September 14, 2025)



303.    High opioid dosages are associated with an increased risk of opioid use disorder and

overdose; the 2016 CDC opioid guidelines recommended that daily opioid dosages should not exceed

90 morphine milligram equivalents (MME).

304.    The CDC estimates that in 2017, 17,000 Iowans lived with opioid use disorder and the

cost of that opioid use disorder was over $3.7 billion dollars, putting the per capita cost of opioid use

disorder in Iowa at $1,196 dollars.[50]

305.    In 2020, 6.5 of every 1,000 births in Iowa were diagnosed with neonatal opioid

withdrawal syndrome.

306.    Moreover, data and research from the CDC shows that drug overdose deaths increased

---

[50] Luo F, Li M, Florence C. State-Level Economic Costs of Opioid Use Disorder and Fatal Opioid
Overdose — United States, 2017. MMWR Morb Mortal Wkly Rep 2021;70:541–546.
DOI: http://dx.doi.org/10.15585/mmwr.mm7015a1 (accessed September 14, 2025).

77

significantly during the COVID-19 pandemic.[51] The CDC estimates that drug overdose deaths in Iowa increased significantly from September 2019 to September 2020.[52]

### C. Facts Specific to Allamakee County

307.    Plaintiff Allamakee County has been deeply affected by the opioid crisis.

308.    Allamakee County is the northeastern most Iowa County and, as of 2024, was home to 14,184 residents.

309.    Hy-Vee pharmacies are located near Allamakee County, in neighboring Fayette County, Iowa (to the southeast), as will as Fillmore County, Minnesota (to the northeast), and La Crosse County, Wisconsin (to the northwest).

310.    Allamakee County is generally agricultural and rural in nature, with significant manufacturing and construction presence. Studies suggest that prescription opioids are a widespread problem across Iowa, and prescription opioid deaths tend to cluster in Iowa's rural counties, such as Allamakee County.[53]

311.    Allamakee County, the farthest northeastern county in Iowa, has been no exception to trends nationally and in Iowa, from 2005 to 2007, Allamakee County demonstrated "Fast Growth" in opioid death rate numbers, and from 2014 to 2016 the number of opioid-use deaths were "Average"

---

[51] See "Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows," New York Times, April

14, 2021, available at https://www.nytimes.com/2021/04/14/health /overdose-deaths-fentanyl-opiodscoronaviurs-

pandemic.html (accessed on 5/6/21).

[52] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (accessed on September 14, 2025)

[53] Understanding the Opioid Crisis in Rural and Urban Iowa, Iowa State University, January 2019, available at https://icash.public-health.uiowa.edu/wp-content/uploads/2019/03/ISU-Opioid-pub-SOC3088.pdf (accessed on September 14, 2025).

for Iowa.[54]



312.    The opioid crisis has evolved over time in Iowa and in Allamakee County, and now heroin, fentanyl, and carfentanil use the lates evolution in the opioid crisis in Allamakee County. Fentanyl and carfentanil are incredibly lethal. Adding to the danger, in some instances fentanyl has been made to look exactly like oxycodone tablets.

313.    Some of Allamakee County's most vulnerable residents have also become victim of the epidemic as the number of children currently in foster care in Allamakee County continues to increase. This is directly related to the opioid epidemic, as parents struggling with opioid addiction may end up unable to care for their children, leading to children being removed from the home.

314.    Additionally, in the past several years there has been a significant increase in babies born addicted to opioids. These infants spend their first months of life suffering from withdrawal, a condition known as "Neonatal Abstinence Syndrome" (NAS). These children often need years to long-

---

[54] Understanding the Opioid Crisis in Rural and Urban Iowa, Iowa State University, January 2019, available at https://icash.public-health.uiowa.edu/wp-content/uploads/2019/03/ISU-Opioid-pub-SOC3088.pdf (accessed on September 14, 2025).

term care and monitoring due to NAS.

315.    Opioid related stories describe a public health crisis of epidemic proportions in Allamakee County. As a practical and financial matter, the County has been saddled with an enormous economic burden. Nearly every department in the County is affected by the opioid crisis in some manner.

316.     While the County has committed substantial resources to address the crisis, the opioid epidemic is nowhere near contained. Fully addressing the crisis requires that those responsible for it pay for their conduct and to abate the nuisance and harms they have created in the County.

## VI.     PLAINTIFF'S CLAIMS ARE TIMELY

### A.  Continuing Conduct

317.    Defendants' wrongful conduct is still ongoing and has caused Plaintiff repeated injuries and/or a continuous injury over many years.

318.    The County continues to suffer harm from the unlawful actions by Defendants.

319.    The continued tortious and unlawful conduct by Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by the  Defendants has not ceased. The public nuisance remains unabated. The conduct causing the damages remains unabated.

### B.  Equitable Estoppel and Fraudulent Concealment

318.    Defendants are also equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive the County and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the County, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with

80

the goal of protecting their registered distributor and/or dispenser status and to continue generating profits.  Notwithstanding the allegations set forth above, the  Defendants affirmatively assured the public, including the County, that they are working to curb the opioid epidemic.

319.    The Defendants were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

320.    The Defendant's also concealed from the County the existence of the County's  claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that their legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic.  They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These repeated misrepresentations misled regulators, prescribers and the public, including the County, and deprived the County of actual or implied knowledge of facts sufficient to put the County on notice of potential claims.

321.    The County did not discover the nature, scope and magnitude of the Defendants' misconduct, and its full impact on the County, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

322.    The Defendants' intended that their actions and omissions would be relied upon, including by the County.  The County did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

323.    The County reasonably relied on the Defendants' affirmative statements regarding their purported compliance with their obligations under the law.

**VII.    SUCCESSOR LIABILITY**

81

324. To the extent that the wrongful acts or omissions alleged herein were committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omission because (1) they expressly or impliedly assumed the predecessor's liability, (2) there was a consolidation or merger of predecessor or successor, (3) the surviving entity was a mere continuation of the predecessor, or (4) when the transaction is entered into fraudulently to escape liability for the debts and liabilities. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a) continuity of shareholders resulting from the purchasing corporation paying for the assets with shares of its own stock so the selling corporation stockholders become a constituent part of the purchasing corporation; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (d) continuity of management, personnel, and general business operation of the predecessor. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## VIII. <u>ALTER EGO LIABILITY</u>

325. To the extent that the wrongful acts or omissions alleged herein were committed or omitted by wholly-owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (1) they dominated and controlled the wholly-owned or majority-owned entity and (2) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**CREATION OF A PUBLIC NUISANCE**
**(Against All Defendants)**

326.     Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

327.     Defendants have intentionally and unlawfully created a public nuisance under Iowa law.

328.     Defendants created and maintained a public nuisance which proximately caused injury to Plaintiff.

329.     Defendants have created and maintained a public nuisance by marketing, distributing, dispensing, and selling opioids in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiff's community, and Plaintiff and the residents of Plaintiff's community have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

330.     The public nuisance is an *absolute* public nuisance because Defendants' nuisance-creating conduct was intentional and unreasonable and/or violated statutes which established specific legal requirements for the protection of others.

331.     The public nuisance is also a *qualified* public nuisance because Defendants' nuisance-creating conduct was negligent and/or entailed a failure to use reasonable care.

332.     Defendants have created and maintained a public nuisance through their ongoing conduct of marketing, distributing, dispensing, and selling opioids, which are dangerously addictive

drugs, in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiff's community, flooded Plaintiff's community with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiff and the residents of Plaintiff's community.

333.    Defendants know, and have known, that their intentional, unreasonable, negligent, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiff's community.

334.    Defendants' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiff's community. *See* Restatement (Second) of Torts § 821B.

335.    The interference is unreasonable because Defendants' nuisance-creating conduct:

    a. Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

    b. At all relevant times was and is proscribed by state and federal laws and regulations; and/or

    c. Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

336.    The significant interference with rights common to the general public is described in detail throughout this Complaint and includes:

    i. The creation and fostering of an illegal, secondary market for prescription opioids;

    ii. Easy access to prescription opioids by children and teenagers;

    iii. A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

84

    iv.  Infants being born dependent on opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

    v.  Employers having lost the value of productive and healthy employees; and

    vi.  Increased costs and expenses for Plaintiff relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

337.    Defendants intentionally and unreasonably, unlawfully, and/or negligently collaborated in deceptive marketing of opioids, acting in concert with opioid manufacturers to promote the false messaging about the treatment of pain and the addictive nature of opioids, to encourage their use by health care providers and patients, and to encourage their pharmacists to fill as many opioid prescriptions as possible in the face of indicia of diversion.  Defendants and Industry members worked in concert with opioid manufacturers and distributors to ensure that the false messaging surrounding the treatment of pain and the addictive nature of opioids was consistent and geared to increase profits for all stakeholders.  Defendants and Industry members invited manufacturers to train and provide messaging to pharmacies' pharmacists to ensure that those pharmacists would continue to fill as many prescriptions as possible despite indicia of diversion.

338.    Defendants intentionally and unreasonably, unlawfully, and/or negligently pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiff's community, a higher level of fear, discomfort and inconvenience to the residents of Plaintiff's community, and direct costs to Plaintiff and Plaintiff's community.

339.    Each Defendant is liable for creating the public nuisance because the intentional and unreasonable, negligent, and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to Plaintiff.

340.    A violation of any rule or law controlling the sale and/or distribution of a drug of abuse in Plaintiff's community constitutes an absolute public nuisance.

341.    In the sale distribution, and dispensation of opioids in Iowa and Plaintiff's community,

85

Defendants violated federal law, including, but not limited to, 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74, and Iowa Law, including, *inter alia*, I.C.A. §§ 124.205-207; I.C.A. § 124.303; I.C.A. §§ 124.306-307.

342.    Defendants' unlawful nuisance-creating conduct includes violating federal and Iowa statutes and regulations, including the controlled substances laws, by

      a. Distributing, dispensing, dispensing, and selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

      b. Distributing, dispensing, and selling without maintaining effective controls against the diversion of opioids;

      c. Choosing not to and/or negligently failing to effectively monitor for suspicious orders;

      d. Choosing not to and/or negligently failing to investigate suspicious orders;

      e. Choosing not to and/or negligently failing to report suspicious orders;

      f. Choosing not to and/or negligently failing to stop or suspend shipments of suspicious orders;

      g. Distributing, dispensing, and selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills;"

      h. Failing to use the data available to them to identify suspicious orders, suspicious red flag prescriptions, and to otherwise prevent or reduce the risk of diversion; and

      i. Acting in concert with opioid manufacturers to promote the false messaging about the treatment of pain and the addictive nature of opioids, to encourage their use by health care providers and patients, and to encourage their pharmacists to fill as many opioid prescriptions as possible in the face of indicia of diversion.

343.    Defendants' intentional, negligent, and/or unreasonable nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, includes:

      a. Distributing, dispensing, and selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

      b. Distributing and dispensing, opioids without maintaining effective controls against the diversion of opioids;

    c.   Choosing not to and/or negligently failing to effectively monitor for suspicious orders;

    d.   Choosing not to and/or negligently failing to investigate suspicious orders;

    e.   Choosing not to and/or negligently failing to report suspicious orders;

    f.   Choosing not to stop or suspend shipments of suspicious orders;

    g.   Distributing, dispensing, and selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills;"

    h.   Failing to use the data available to them to identify suspicious orders, suspicious red flag prescriptions, and to otherwise prevent or reduce the risk of diversion; and

    i.   Acting in concert with opioid manufacturers to promote the false messaging about the treatment of pain and the addictive nature of opioids, to encourage their use by health care providers and patients, and to encourage their pharmacists to fill as many opioid prescriptions as possible in the face of indicia of diversion.

344.    Conduct that violates federal law, including, but not limited to, 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74, and Iowa Law, including, *inter alia*, I.C.A. §§ 124.205-207; I.C.A. § 124.303; I.C.A. §§  124.306-307.

345.    Defendants intentionally, negligently, and/or unreasonably distributed, dispensed, and sold opioids that Defendants knew would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

346.    Defendants are in the business of marketing, distributing, and/or dispensing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because inter alia these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

347.    Indeed, opioids are akin to medical-grade heroin. Defendants' wrongful conduct of deceptively marketing and pushing as many opioids onto the market as possible led directly to the

public nuisance and harm to Plaintiff—exactly as would be expected when medical-grade heroin in the form of prescription opioids are deceptively marketed, flood the community, and are diverted into an illegal, secondary market.

348. Despite this knowledge, Defendants negligently, unreasonably and/or unlawfully marketed and pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics.

349. Defendants owed the public legal duties, including:

   a. a preexisting duty not to expose the County and its residents to an unreasonable risk of harm;
   b. a duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in marketing, selling, dispensing, and/or distributing opioids; and

   c. a duty not to breach the standard of care established under Iowa laws and the federal Controlled Substances Act ("CSA") and their respective implementing regulations to report suspicious prescribing and to maintain systems to detect and report such activity.

350. As evidence of addiction and abuse of opioids widened, Defendants were obligated to rein in their supply, prevent diversion, and mitigate the harms from opioid overuse and abuse, but intentionally and unreasonably and/or negligently failed to do so.

351. The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in marketing, distributing, dispensing, and selling dangerously addictive drugs requires a high degree of care and places them in a position of great trust and responsibility. Their duty cannot be delegated.

352. Each Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate with the dangers involved in selling dangerous controlled substances.

353. The County does not only allege that Defendants were negligent for failure to protect from harm. Defendants engaged in affirmative conduct, the foreseeable result of which was to cause

harm to the County and its citizens.

354.    Defendants know, and should have known, that their unreasonable and unlawful conduct does cause, has caused, and will continue to cause, excessive availability of opioids in Allamakee County and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Allamakee County and its residents.

355.    Despite this knowledge, Defendants intentionally, negligently, unreasonably and/or unlawfully marketed and pushed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics.

356.    Defendants had control over their conduct in Plaintiff's community and that conduct has had an adverse effect on rights common to the general public.  Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. Each of the Defendants controlled the systems they developed to prevent diversion, whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market.

357.    It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Plaintiff described herein.

358.    Reasonably prudent distributors and dispensers of prescription opioids would have anticipated that the conduct alleged herein would create a public nuisance in the County, and that the public nuisance created would unreasonably interfere with the public health, safety, comfort and convenience of the County and its residents.

359.    Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

360. The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Plaintiff's community and the harm inflicted outweighs any offsetting benefit.

361. The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

362. As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, the County has taken proactive measures to abate the public nuisance, and the County seeks to expand these efforts.

363. As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiff has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

364. The nuisance created by Defendants' conduct is abatable.

365. Defendants' misconduct alleged in this case is ongoing and persistent.

366. Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

367. Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary public services.

368. Plaintiff seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

369. Plaintiff has suffered, and will continue to suffer, unique harms as described in this Complaint, which are of a different kind and degree than Iowa citizens at large. These are harms that

can only be suffered by Plaintiff.

370.    Plaintiff is asserting their own rights and interests and Plaintiff's claims are not  based upon or derivative of the rights of others.

371.    The tortious conduct of each Defendant was a substantial factor in creating the absolute and/or qualified public nuisance.

372.    The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiff.

373.    Plaintiff has suffered an indivisible injury as a result of the tortious conduct of Defendants.

374.    Each Defendant is joint and severally liable for creating the public nuisance.

375.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

376.    Plaintiff asserts this Cause of Action as an equitable tort claim under the common law for absolute and/or qualified public nuisance.

377.    Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, punitive damages, and all damages allowed by law to be paid by the Defendants, attorney fees and costs, and pre and post-judgment interest.

## SECOND CLAIM FOR RELIEF
### NEGLIGENCE
### (Against All Defendants)

318.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

**A. DUTY**

378.    Defendants owed Plaintiff a duty to not expose Plaintiff to an unreasonable risk of harm.

379.    Defendants had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in manufacturing, advertising, marketing, selling, distributing and/or dispensing opioids.

380.    All Defendants owe a duty under federal law to provide effective controls and procedures to guard against diversion. 21 U.S.C. § 823; 21 C.F.R. § 1301.71(a).

381.    All Defendants owe a duty under federal law, 21 U.S.C. § 823 and 21 CFR § 1301.74, to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Iowa counties.

382.    All Defendants had a duty not to breach the standard of care established the federal CSA and its implementing regulations to report suspicious orders and to maintain systems to detect and report such activity.

383.    The CSA and its implementing regulations create restrictions on the distribution of controlled substances. See 21 U.S.C. §§ 801-971; 21 C.F.R. §§ 1300-1321.

384.    Hy-Vee owes a duty under federal law to only fill prescriptions that are written for a legitimate medical purpose. See 21 C.F.R. § 1306.04(a).

385.    The main objectives of the CSA are to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances. Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels. To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. The CSA categorizes all controlled substances into five schedules. The drugs are grouped together based on their accepted

medical uses, the potential for abuse, and their psychological and physical effects on the body. Each schedule is associated with a distinct set of controls regarding the manufacture, distribution, dispensing and use of the substances listed therein. The CSA and its implementing regulations set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping. Gonzales v. Raich, 545 U.S. 1, 12–14 (2005) (internal citations omitted).

386. The CSA authorizes the DEA to establish a registration program for manufacturers, distributors, and dispensers of controlled substances designed to prevent the diversion of legally produced controlled substances into the illicit market. H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970); see 21 U.S.C. § 801(2); 21 U.S.C. §§ 821-824, 827, 880. Any entity that seeks to become involved in the production or chain of distribution of controlled substances must first register with the DEA. 21 U.S.C. § 822; 21 C.F.R. § 1301.11.

387. The CSA provides for control by the Justice Department of problems related to drug abuse through registration of manufacturers, wholesalers, retailers, dispensers and all others in the legitimate distribution chain, and makes transactions outside the legitimate distribution chain illegal. 1970 U.S.C.C.A.N. 4566, 4569 (emphasis added).

388. "Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic." United States v. Moore, 423 U.S. 122, 135 (1975).

389. The CSA is designed to improve the administration and regulation of the manufacturing, distribution, and dispensing of controlled substances by providing for a "closed" system of drug distribution for legitimate handlers of such drugs. Such a closed system is intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and

dangerous drug control. 1970 U.S.C.C.A.N. 4566, 4571-72.

390.    Defendants as distributors are one of the key components of the distribution chain.

391.    If the closed system is to function properly as Congress envisioned, distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.

392.    The closed system of the CSA is specifically designed with checks and balances between registrants to ensure that controlled substances are not diverted from this closed system.

393.    Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations carefully define each participant's role and responsibilities.

394.    Federal law imposes a duty upon the Defendants to comply with applicable State and local law. 21 U.S.C. § 823(a)(2), (b)(2).

395.    Iowa law requires all manufacturers, distributors and dispensers of controlled substances drugs to register with the Board of Pharmacy. I.C.A.§ 124.302. To receive and maintain their license, each Defendant registered had a duty to comply with federal, state, and local laws regarding the distribution of drugs. I.C.A § 124.306.

396.    The Iowa Board of Pharmacy has the authority to suspend or revoke licenses or registrations issued to wholesale distributors who violate Board of Pharmacy regulations. *Id.*

397.    The federal mandates incorporated into Iowa law require that Defendants must maintain effective control against diversion. *Id.*

398.    As alleged above, in addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as

potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

399.    Federal and Iowa and regulations require Defendants to act as gatekeepers guarding against the diversion of the highly addictive, dangerous opioid drugs. See 21 U.S.C. § 823; 21 C.F.R. § 1301.74; 21 C.F.R. § 1306.04; I.C.A. § 124.306.

400.    These duties are well known to the Defendant. "DEA regulations that have been in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders)."[55]

401.    Defendants owe a duty to monitor and detect suspicious orders of prescription opiates originating from Iowa counties.

402.    Defendants owe a duty to investigate suspicious orders of prescription opiates originating from Iowa counties.

403.    Defendants owe a duty to refuse suspicious orders of prescription opiates originating from Iowa counties.

404.    Defendants owe a duty to report suspicious orders of prescription opiates originating from Iowa counties.

405.    Defendants owe a duty to prevent the diversion of prescription opiates into illicit markets in Allamakee County.

406.    Hy-Vee owes a duty to only fill prescriptions that are written for a legitimate medical purpose in Iowa counties.

407.    The foreseeable harm from a breach of this duty is the diversion of prescription opiates

---

[55] See Brief for HDMA and NACDS, *4, *Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin*.

for nonmedical purposes.

408.    The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in marketing, distributing, dispensing and selling dangerously addictive drugs requires a high degree of care and places them in a position of great trust and responsibility in relation to Plaintiff. Their duty cannot be delegated.

## B.  BREACH

409.    Each Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate with the dangers involved in selling dangerous controlled substances.

410.    Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on distributors, along with manufacturers and dispensers, to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system created by the CSA collapses.

411.    Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels in violation of 21 U.S.C. §§ 823(a)(1), (b)(1).

412.    Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the DEA of "suspicious orders when discovered" in violation of 21 CFR § 1301.74(b).

413.    Defendants breached their duty to provide effective controls and procedures to guard against theft and diversion of controlled substances.

414.    Defendants repeatedly and purposefully breached their duties under federal and state law which is a direct and proximate cause of the diversion of prescription opiates for nonmedical

purposes in Allamakee County.

415. Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into other legitimate medical, scientific and industrial channels.

416. Defendants have abandoned their duties imposed under federal and state law, taken advantage of a lack of DEA law enforcement in Iowa and abused the privilege of distributing controlled substances in Iowa counties.

417. All Defendants breached their duty to Plaintiff by, inter alia:

   a. Marketing, distributing, dispensing and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;
   b. Marketing, distributing, dispensing and/or selling opioids without maintaining effective controls against the diversion of opioids;
   c. Choosing not to effectively monitor for, investigate or report suspicious orders;
   d. Choosing not to stop or suspend shipments of suspicious orders; and
   e. Distributing, dispensing and/or selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

418. Defendants also breached their duties to Plaintiff by dispensing prescriptions without ensuring that they were issued for a legitimate medical purpose.

419. Defendants have engaged in affirmative acts of creating an illegal, secondary prescription opioid market by failing to exercise adequate control over the marketing, distribution, dispensing and sale of their prescription opioids.

420. Defendants were negligent by marketing, distributing, dispensing and selling opioids in a way that created and fostered an illegal, secondary prescription opioid market that resulted in a foreseeable and unreasonable risk of harm to Plaintiff.

421. The method by which Defendants created this market was by marketing, distributing, and selling opioids without regard to the likelihood that the opioids would be placed in the hands of criminals, people addicted to opioids, juveniles, and others not permitted to use or possess prescription opioids.

422.    Defendants were negligent by marketing, distributing, dispensing and selling opioids in a way that created and fostered an illegal, secondary prescription opioid market that resulted in a foreseeable and unreasonable risk of harm to Plaintiff.

423.    The method by which Defendants created this market was by marketing, distributing, and selling opioids without regard to the likelihood that the opioids would be placed in the hands of criminals, people addicted to opioids, juveniles, and others not permitted to use or possess prescription opioids.

## C.  CAUSATION

424.    Defendants' misconduct as alleged above is a direct and proximate cause of the diversion of prescription opiates into the illicit market for nonmedical purposes in Allamakee County.

425.    All Defendants' failure to monitor, detect, investigate, refuse and report suspicious orders is a direct and proximate cause of the diversion of prescription opiates into the illicit market for nonmedical purposes in Allamakee County.

426.    Hy-Vee's failure to ensure that it was dispensing prescription opioids only written for a legitimate medical purpose is a direct and proximate cause of the diversion of prescription opiates into the illicit market for nonmedical purposes in Allamakee County.

427.    The unlawful conduct by Defendants caused the very harm the federal and state laws were intended to prevent; namely, the diversion of prescription opiates for nonmedical purposes.

428.    The unlawful diversion of prescription opiates is a direct and proximate cause of prescription opiate abuse, addiction, morbidity and mortality in Allamakee County.

429.    The unlawful diversion of prescription opiates is a direct and proximate cause of the opioid epidemic in Allamakee County.

430.    The unlawful diversion of prescription opiates is a direct and proximate cause of the heroin and fentanyl epidemic in Allamakee County.

431.    The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin.

432.    According to the CDC, most of the overdoses from non-prescription opioids such as heroin or illicit fentanyl are also directly related to prescription pills.

433.    Plaintiff does not allege that Defendants were negligent for failure to protect from harm. Rather, Defendants engaged in conduct the foreseeable result of which was to cause harm to Plaintiff.

434.    The increased use of prescription painkillers for nonmedical reasons (without a prescription for the high they cause), along with growing sales, has contributed to a large number of overdoses and deaths.

435.    The public health dangers associated with the diversion and abuse of controlled prescription drugs have been well-recognized over the years by Congress, the DEA, various trade groups such as NACDS and their members, and public health authorities.

436.    A reasonably prudent opioid distributor or dispenser should have anticipated an injury to Plaintiff as a probable result of marketing, distributing, dispensing and/or selling prescription opioids in this manner.

437.    It was reasonably foreseeable that Defendants' actions and omissions would result in the harm to Plaintiff as described herein.

438.    Defendants had control over their conduct in Iowa and in Allamakee County. Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders. Defendants had control over their procedures to ensure pharmacists only dispensed opioids issued for a legitimate medical purpose. Each of the Defendants controlled the systems they developed to prevent diversion.

439.    Because each of the Defendants' special positions within the closed system of opioid

distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid, heroin and fentanyl overuse, abuse, and addiction that now exists would have been averted.

440.    Reasonably prudent, distributors and/or dispensers of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the significant costs which would be imposed upon the governmental entities associated with those communities. Indeed, it is a violation of Iowa law and federal law for Defendants not to report suspicious orders and exercise due diligence not to ship such orders unless and until the suspicion has been removed and for Hy-Vee to dispense opioids not issued for a legitimate medical purpose.

441.    Defendants' actions were not "authorized" by Iowa regulations because Defendants did not comply with the mandatory terms of the registrations and licenses issued to them by Iowa authorities or with federal requirements incorporated by reference, as further detailed in this Complaint.

### D. DAMAGES

442.    As a direct and proximate result of Defendants' negligence and/or negligence per se, Plaintiff has suffered and will continue to suffer economic damages including, but not limited to, significant expenses for police, emergency, health, and other services.

443.    As a direct and proximate result of Defendants' negligence and/or negligence per se, Plaintiff has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

444.    As a direct and proximate result of Defendants' negligent, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts, there is now a national opioid epidemic that has caused enormous harm and injury to the Plaintiff and Allamakee County.

445.    Defendants' misconduct alleged in this case is ongoing and persistent.

446.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

447.    Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary public services.

448.    Plaintiff has suffered an indivisible injury as a result of the tortious conduct of Defendants.

449.    The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiff.

450.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

451.    Plaintiff seeks all legal and equitable relief as allowed by law, including inter alia, injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all economic damages allowed by law to be paid by the Defendants, attorneys' fees and costs, and expenses of suit, and pre- and post-judgment interest.

### THIRD CLAIM FOR RELIEF

### VIOLATIONS OF IOWA'S PRIVATE RIGHT OF ACTION
### FOR CONSUMER FRAUDS ACT
### (Against All Defendants)

452.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

453.    The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code § 714H.3, prohibits the "unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact" with intent to sell or to induce the sale of opioids.

454.    During the relevant periods and as detailed further herein, Defendants have engaged in unconscionable and unfair acts or practices by omitting the material fact of their failure to design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders, as required of "registrants" by the federal CSA. 21 C.F.R. § 1301.74(b). The CSA defines "registrant" as any person who is registered pursuant to 21 U.S.C. § 823. 21 C.F.R. § 1300.02(b). Section 823(a)-(b) requires distributors of Schedule II controlled substances to register.

455.    Defendants further engaged in unconscionable and unfair acts or practices by omitting the material fact of their failure to implement effective policies and procedures to guard against diversion from their retail stores at the dispensing level.

456.    All Defendants' unconscionable, unfair, or deceptive acts or practices in violation of Iowa Code § 714.H.3 offend public policy, are immoral, unethical, oppressive, and unscrupulous, as well as malicious, wanton, and manifesting of ill will, and they caused substantial injury to the Plaintiff. Plaintiff risks irreparable injury as a result of Defendants' acts, misrepresentations, and omissions in violation of Iowa Code § 714H.3, and these violations present a continuing risk to Plaintiff, as well as to the general public. Increased risk of future harm due to the widespread addiction caused by Defendants' acts and practices and widespread manipulation of the medical profession.

457.    Defendants acts and practices in violation of Iowa Code § 714H.3 offend public policy, are immoral, unethical, oppressive or unscrupulous, as well as malicious, wanton, and manifesting ill will; caused and  continue to cause substantial injury to Plaintiffs and its inhabitants; and put Plaintiff

at increased risk of future harm.

458.    As a direct and proximate result of Defendants' violations of Iowa Code § 714H.3, Plaintiff has suffered and continues to suffer losses constituting injury-in-fact. Plaintiff is entitled, and does hereby seek, to recover its actual damages and its attorneys' fees and costs.

459.    Plaintiff has been seriously aggrieved by Defendants' violations of Iowa Code § 714H.3 and is therefore entitled to, and does hereby, seek and order declaring Defendants' acts and practices unlawful under and in violation of Iowa Code § 714H.3 and enjoining Defendants' unfair, unconscionable, and/or deceptive acts or practices, and awarding attorneys' fees, costs, and any other just and proper relief available under Iowa Code § 714H.3.

### FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against All Defendants)

460.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

461.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution and purchase of opioids within Iowa and Allamakee County, including from opioids foreseeably and deliberately diverted within and into Allamakee County.

462.    Unjust enrichment arises not only where expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

463.    Plaintiff has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

464.    These expenditures include the provision of healthcare services and treatment services to people who use opioids.

465.    These expenditures have helped sustain Defendants' businesses.

466.    Plaintiff has conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper distribution and/or dispensing practices.

467.    Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

468.    Plaintiff has paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products. Because of their conscious failure to exercise due diligence in preventing diversion, all Defendants obtained enrichment they would not otherwise have obtained. The enrichment was without justification and Plaintiff lacks a remedy provided by law.

469.    Defendants have unjustly retained benefits to the detriment of Plaintiff, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

470.    Defendants' misconduct alleged in this case is ongoing and persistent.

471.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

472.    Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary public services.

473.    By reason of Defendants' unlawful acts, Plaintiff has been damaged and continues to

be damaged, in a substantial amount to be determined at trial.

474.    Plaintiff seeks an order compelling Defendants to disgorge all unjust enrichment to Plaintiff; and awarding such other, further, and different relief as this Honorable Court may deem just.

## **PUNITIVE DAMAGES**

475.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

476.    By engaging in the above-described intentional and/or unlawful acts or practices, Defendants acted maliciously toward Plaintiff and with an intentional disregard of the Plaintiff's rights and the safety of Plaintiff's County. Defendants acted oppressively, with conscious disregard for the rights of others and/or in a reckless, wanton, willful, or grossly negligent manner. Defendants acted with a prolonged intentional disregard to the adverse consequences of their actions and/or omissions. Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm. Defendants acted toward Plaintiff with malice and were grossly negligent in failing to perform the duties and obligations imposed upon them under applicable federal and state statutes and common law.

477.    Defendants were marketing, distributing, and/or dispensing dangerous drugs statutorily categorized as posing a high potential for abuse and sever dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the State and Plaintiff's County by these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence and the safety of the community, and an award of punitive

damages is appropriate as punishment and a deterrence.

478.    By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and exhibited an entire want of care that would raise the level of actual malice and/or a conscious, reckless, and outrageous indifference to the health, safety, and welfare of the Plaintiff and others.

### **PRAYER FOR RELIEF**

479.    The County respectfully requests that this Court enter an order of judgment granting all relief requested in this complaint, and/or allowed at law or in equity, including:

   a.   abatement of the nuisance;

   b.   actual damages;

   c.   treble or multiple damages and civil penalties as allowed by statute;

   d.   punitive damages;

   e.   exemplary damages;

   f.   equitable and injunctive relief in the form of Court-enforced corrective actions and communications;

   g.   forfeiture disgorgement, restitution, and/or divestiture of proceeds and assets;

   h.   attorneys' fees;

   i.   costs and expenses of suit;

   j.   pre- and post-judgment interest; and

   k.   such other and further relief as this Court deems appropriate.

### **JURY DEMAND**

480.    The County demands trial by jury on all questions so triable.

Dated: September 15, 2025

Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com

Sarah Burns
SIMMONS HANLY CONROY
One Court Street
Alton, IL 62002
(618) 250-2222
sburns@simmonsfirm.com

Erin K. Dickinson
Charles J. Crueger
**CRUEGER DICKINSON LLC**
4532 N Oakland Avenue
Whitefish Bay, WI 53211
(414) 210-3868
ekd@cruegerdickinson.com
cjc@cruegerdickinson.com

*/s/ Peter Weinberger*
Peter Weinberger
SPANGENBERG SHIBLEY & LIBER, LLP
1001 Lakeside Avenue, E, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com